**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PHILIP THORMAN, and the class of
similarly situated persons who
worked aboard the factory trawlers
managed by the in personam
defendants,
                    *Plaintiff-Appellant,*

                    v.

AMERICAN SEAFOODS COMPANY;
AMERICAN SEAFOODS COMPANY
LLC, In Personam; OCEAN ROVER
F/T; AMERICAN TRIUMPH F/T;
NORTHERN EAGLE F/T; NORTHERN
HAWK F/T; NORTHERN JAEGER F/T;
AMERICAN DYNASTY F/T; AMERICAN
EXPRESS F/T; VICTORIA ANN F/V;
CHRISTINA ANN F/T; KATIE ANN
F/T; PACIFIC SCOUT F/V, and other
vessels managed by the in
personam defendants, their
engines, tackle, equipment,
appurtenances, freights, and cargo,
In Rem,
                    *Defendants-Appellees.*

No. 03-36012
D.C. No.
CV-01-01684-TSZ
OPINION

Appeal from the United States District Court
for the Western District of Washington
Thomas S. Zilly, District Judge, Presiding

Argued and Submitted
June 7, 2005—Seattle, Washington

Filed September 1, 2005

12057

Before: Warren J. Ferguson, Robert R. Beezer, and
M. Margaret McKeown, Circuit Judges.

Opinion by Judge McKeown;
Concurrence by Judge Ferguson

## COUNSEL

Bradley H. Bagshaw, Helsell Fetterman LLP, Seattle, Washington, for the plaintiff-appellant.

Jay H. Zulauf, Hall Zanzig Zulauf Clafin McEachern, Seattle, Washington; J. David Stahl, Christopher S. McNulty, and Christopher T. Wion, Mundt MacGregor LLP, Seattle, Washington, for the defendants-appellees.

## OPINION

McKEOWN, Circuit Judge:

Philip Thorman, on behalf of a class of similarly situated crew members, appeals the district court's grant of summary judgment in favor of American Seafoods Company and American Seafoods Company LLC (in personam defendants) as well as various vessels owned by these companies (in rem defendants) (the defendants collectively, "American Seafoods"). The district court concluded that Thorman's claims were time-barred because the contractual six-month limit on disputes had expired. We agree and affirm the district court's summary judgment order.

Crucial to our decision is that the merits of Thorman's claims are not before us. Instead, we are faced with the threshold issue of whether Thorman has overcome the six-month time-bar to his claims. To surmount this preliminary hurdle, he must establish either fraudulent concealment, which requires proof of "affirmative conduct upon the part of [American Seafoods] which would, under the circumstances of the case, lead a reasonable person to believe that he did not have a claim for relief," *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1415 (9th Cir. 1987) (quoting *Gibson v. United States*, 781 F.2d 1334, 1345 (9th Cir. 1986)), or that American Seafoods owed him a fiduciary duty, as passive concealment is insufficient for a court to grant equitable tolling "unless the defendant had a fiduciary duty to disclose information to the plaintiff." *Conmar Corp. v. Mitsui & Co. (U.S.A.)*, 858 F.2d 499, 505 (9th Cir. 1988). We hold that, as

a matter of law, Thorman has failed to establish that American Seafoods engaged in affirmative conduct to conceal the underlying claims. Nor does our precedent support the imposition of a fiduciary duty on American Seafoods to disclose its precise methods for estimating the value of the catch.

## FACTUAL AND PROCEDURAL BACKGROUND

Thorman worked as an on-board fish processor for American Seafoods for several seasons between 1996 and 2000.[1] Under the crew member agreements executed for each trip, American Seafoods agreed to calculate Thorman's wages based on the quantity and value of the catch, a common compensation method in the fishing industry. *See, e.g.*, *TCW Special Credits v. Chloe Z Fishing Co.*, 129 F.3d 1330, 1331 (9th Cir. 1997) (explaining that it is typical to compensate crew members by multiplying their rate, which is based on "rank, job classification, duties and ability," by the amount of fish caught). After each trip, American Seafoods mailed Thorman a paycheck along with a settlement sheet that listed how the earnings had been calculated based on the contractual formula.

Thorman's claims hinge on the way in which American Seafoods estimated the value of the catch. Under the contracts, wages were based on American Seafoods' preseason estimate of the sale prices rather than the post-season prices that the catch actually fetched. American Seafoods multiplied this predetermined estimate—termed in the contracts as the "posted sales price" or "posted price" of fish products—by each crew member's share to determine individual compensa-

---

[1]Claims arising out of Thorman's last season were decided in *Flores v. American Seafoods Co.*, 335 F.3d 904 (9th Cir. 2003), in which Thorman was a class member. Unlike the present action, the *Flores* plaintiffs initiated their claims "soon after returning to Seattle from the Bering Sea," *id.* at 909, and thus they were not faced with the threshold time-bar hurdle at issue here.

tion for the trip. Thorman argues that American Seafoods did not implement the contracts in good faith because it underestimated the gross prices it expected to receive from selling the fish and reduced those estimates by excessive deductions for sale costs.

American Seafoods used two slightly different, but substantially similar, compensation clauses during the period at issue: The form used prior to the 1999 pollock B season ("Old Contract") and the form used commencing with the 1999 pollock B season ("New Contract").

The Old Contract provides, in part, as follows:

> [American Seafoods] shall pay Crew Member a production share. The total production share earned by Crew Member shall be calculated by multiplying the production share of __[2] by the posted sales price of fish product(s) processed aboard the vessel. . . . Crew Member understands that the posted prices upon which compensation is based, is set at the sole discretion of the Company. Actual final sales prices may be greater or less than stated in the posted price but will not alter or affect Crew Member's settlement for the trip at any time.

The basic compensation scheme did not change under the New Contract, but American Seafoods revised the compensation clause to read as follows:

> 4.1   . . . Crew Member shall be paid __ share(s) for each trip completed. . . .

> 4.2   The value of one share is calculated by totaling the number of assigned shares of all the Crew Mem-

---

[2]American Seafoods filled in this blank in the form contract with the production share assigned to the contracting crew member for the trip.

bers working at the start of the trip and dividing that sum into the crewshare pool. The total number of assigned shares will be posted prior to the start of each trip. . . . The posted price for products produced on the vessels will be communicated to all vessels prior to the start of each trip. The prices posted are the company's good faith estimate of the market price of products produced aboard the vessels with deductions taken for costs of product shipment, packaging supplies, additives and costs of fish purchases if applicable.

4.3   Posted Prices are set at [American Seafoods'] sole discretion. Actual sales prices may be greater or less than the posted prices.

Significantly, each contract included a "Time for Claims" clause that limited claims arising out of the contract or the employment relationship in general to six months after the contract was completed or terminated. Although the final contract at issue was completed in October 1999, Thorman did not commence this lawsuit until October 2001—well past the six-month limit set forth both in the contracts and by statute for in rem wage claims brought by crew members aboard fishing vessels. *See* 46 U.S.C. § 10602(a).

Nonetheless, Thorman argues that the suit is timely because it was brought within six months after American Seafoods produced a Confidential Offering Memorandum in another lawsuit, which he contends finally brought his claims to light. The Offering Memorandum provides:

[The compensation structure] pays crew employees based on the total production value of the vessel. In an effort to provide crew members with more certainty of income, the value of the vessel is computed using expected market prices that the Company [i.e., American Seafoods Group LLC] posts on the vessels

prior to their departures. These prices are typically slightly lower than expectations since the Company ultimately assumes the burden of changing market conditions with respect to the effect of prices on crew compensation.

In his complaint, Thorman claims, "Until April 20, 2001, [the date on which the Offering Memorandum was produced,] defendants fraudulently concealed from plaintiffs their policy of low-balling crew prices, thereby preventing plaintiffs from discovering the causes of action asserted here."

The district court granted American Seafoods' motion for summary judgment and dismissed Thorman's claim as time-barred. The court concluded that Thorman failed to establish fraudulent concealment as a matter of law as to all claims. Alternatively, the district court determined that Thorman's action under the New Contract was barred because he had actual knowledge of the facts underlying his New Contract claims prior to the release of the Offering Memorandum. The court further held that American Seafoods did not owe Thorman a fiduciary duty to disclose the methodology for setting estimated prices.

## ANALYSIS

We review the district court's grant of summary judgment de novo, "determin[ing] whether the evidence, viewed in a light most favorable to the nonmoving party, presents any genuine issues of material fact and whether the district court correctly applied the law." *Seattle-First Nat'l Bank v. Conaway*, 98 F.3d 1195, 1196 (9th Cir. 1996) (quoting *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995)). Typically, a district court's decision on equitable tolling is "reviewed for an abuse of discretion, unless the facts are undisputed, in which event the legal question is reviewed de novo." *Santa Maria v. Pac. Bell*, 202 F.3d 1170, 1175 (9th Cir. 2000); *see also Jones v. Blanas*, 393 F.3d 918, 926 (9th

Cir. 2004) (same). Here, de novo review is proper both because this case reaches us on review from a grant of summary judgment and because the evidence on which Thorman relies is undisputed.

## I.   No Fraudulent Concealment

[1] Like other forms of equitable relief, fraudulent concealment applies to suits in admiralty. *Cf. Vaughan v. Atkinson*, 369 U.S. 527, 530 (1962) ("Equity is no stranger in admiralty; admiralty courts are, indeed, authorized to grant equitable relief."). To establish fraudulent concealment,[3] Thorman carries the burden of proving that (1) American Seafoods "affirmatively misled" him as to the operative facts that gave rise to his claim, and (2) Thorman "had neither actual nor constructive knowledge" of these operative facts despite his diligence in trying to uncover them. *Conmar*, 858 F.2d at 502. Even viewing the facts in the light most favorable to Thorman, he fails to establish a genuine issue of material fact as to whether American Seafoods affirmatively misled him such that a reasonable person would believe that he did not have a claim for relief. *See id.*

[2] Thorman primarily relies on the settlement sheets for

---

[3]Courts vary in their descriptions of the contours of this equitable doctrine and how it blends together with other forms of equitable relief. *See, e.g.*, *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194 (1997) ("[S]ome courts have said [that the doctrine of fraudulent concealment] 'equitably tolls' the running of a limitations period, while other courts have said it is a form of 'equitable estoppel.' ") (citations omitted). In this circuit, fraudulent concealment and equitable estoppel are overlapping doctrines: "Equitable estoppel . . . may come into play if the defendant takes active steps to prevent the plaintiff from suing in time—a situation that the Seventh Circuit terms fraudulent concealment." *Johnson v. Henderson*, 314 F.3d 409, 414 (9th Cir. 2002) (internal quotation marks omitted); *see also Santa Maria*, 202 F.3d at 1178 ("[N]one of the supposed fraudulent concealments about which Santa Maria complains warrants the application of equitable estoppel as a matter of law.").

evidence of active concealment within the six-month limit,[4] claiming that use of the word "value" on the sheets falsely represented that the company used market value to pay the crew. The evidence does not support this reading. In fact, American Seafoods disclosed to Thorman the terms under which he was to be paid: Thorman's contracts were clear on their face that actual final sales prices may be higher or lower than the prices posted on the ship and that the "posted prices" were determined by American Seafoods in its "sole discretion." Thorman agreed in his deposition that he understood American Seafoods was committed to calculating wages based on the prices posted on the vessel during the voyage, and American Seafoods used these prices. Further, Thorman offers no evidence that American Seafoods made any representations to him that the amounts under the "value" column reflected the actual market value at the time of sale. Thorman's notion that a precise fair market value, rather than an estimated value, is the bellwether for the contracts finds no support in the record.

**[3]** Nor does testimony given in prior litigation constitute "affirmative conduct upon the part of [American Seafoods] which would, under the circumstances of the case, lead a reasonable person to believe that he did not have a claim for relief." *Rutledge v. Boston Woven Hose & Rubber Co.*, 576 F.2d 248, 250 (9th Cir. 1978). Significantly, Thorman points to the testimony of Chris McReynolds, a vice president for American Seafoods. That testimony from a prior lawsuit did not take place until April 30, 1999—well past the six-month claim period for all trips at issue except the final one. Turning to the substance of his testimony, McReynolds stated that

---

[4]Although Thorman focuses on the contractual six-month bar, the doctrine of fraudulent concealment equally applies to the statutory six-month bar under 46 U.S.C. § 10602 because the doctrine "is read into every federal statute of limitation." *See Fed. Election Comm'n v. Williams*, 104 F.3d 237, 240 (9th Cir. 1996) (quoting *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946)).

prior to each season, "I look into my crystal ball, take a look at what happened in the past, look at what the upcoming market condition is, and then try to prepare what I think the market price is going to be . . . ." He further explained that the company tried to estimate prices "generally right": "The market goes up, market goes down: we all benefit or get penalized one way or another." These isolated, equivocal statements made after the time limitation expired hardly create a genuine issue of material fact that American Seafoods affirmatively prevented Thorman from discovering claims arising out of the final trip at issue. Indeed, McReynolds's explanation is nothing more than a recitation of the contract terms.

Thorman's reliance on the testimony of William R. Stokes, president of an affiliate of American Seafoods, is similarly misplaced. Taken in March 1998, the testimony has the potential to toll only claims arising out of Thorman's last trip in 1997. Fatal to his claim, Thorman has not identified any statements made in the deposition that are tantamount to concealment of his claims. Like McReynolds, Stokes simply confirmed what was clear in the contract. More problematic for Thorman is the requirement to "establish that [his] failure to have notice of [his] claim was the result of affirmative conduct *by the defendant*." *Conmar*, 858 F.2d at 505 (emphasis added). Although Stokes's employer was an affiliate of American Seafoods, at the time of the deposition, Stokes was not employed by American Seafoods. Nor was Stokes testifying on behalf of American Seafoods, which was not even a party to the litigation. In light of this tangential connection to American Seafoods, Stokes's testimony cannot serve as affirmative conduct on the part of American Seafoods for purposes of the fraudulent concealment analysis.

**[4]** Finally, Thorman's contention that American Seafoods made no effort to describe how it set posted prices and kept secret its actual sales prices and costs does not rescue his fraudulent concealment claim because the defendants' "silence or passive conduct does not constitute fraudulent con-

cealment." *Volk*, 816 F.2d at 1416; *see also Leong v. Potter*, 347 F.3d 1117, 1123 (9th Cir. 2003) ("Equitable estoppel focuses on the defendant's wrongful actions preventing the plaintiff from asserting his claim."); *Grimmett v. Brown*, 75 F.3d 506, 514 (9th Cir. 1996) ("The doctrine of fraudulent concealment is invoked only if the plaintiff both pleads and proves that the defendant *actively* misled her . . . ." ). Merely keeping someone in the dark is not the same as affirmatively misleading him. *Cf. Santa Maria*, 202 F.3d at 1176 ("Equitable estoppel focuses primarily on the actions taken by the defendant in preventing a plaintiff from filing suit . . . .")

Indeed, Thorman's fraudulent concealment claim is all the more curious because he acknowledged that he understood his compensation was not determined by the catch's market value. And, when asked at his deposition whether anyone at American Seafoods made any representations to him that it used its best estimates of the fair market value in setting posted prices, Thorman replied, "No." *Cf. Volk*, 816 F.2d at 1416 ("Appellants do not present any facts indicating an affirmative effort on the part of any appellee to mislead them or to conceal the fraud."). Thorman further stated his understanding that, under the contracts, he needed to bring any claims within six months of the end of the employment period at issue.

[5] We therefore agree with the district court that the settlement sheets and testimony given in prior litigation do not constitute "affirmative conduct upon the part of [American Seafoods] which would, under the circumstances of the case, lead a reasonable person to believe that he did not have a claim for relief." *Id.* at 1415 (quoting *Gibson*, 781 F.2d at 1345). Having failed to satisfy this critical component of his claim, Thorman has not established fraudulent concealment as a matter of law. We need not reach the issue whether Thorman's claims also fail because he did not establish that he "had neither actual nor constructive knowledge of the facts

giving rise to [his] claim despite [his] diligence in trying to uncover those facts." *Conmar*, 858 F.2d at 502.

## II.    No Fiduciary Duty

**[6]** The principle that passive concealment is insufficient for a court to grant equitable tolling under the doctrine of fraudulent concealment bears one caveat—"unless the defendant had a fiduciary duty to disclose information to the plaintiff." *Id.* at 505; *see also Rutledge*, 576 F.2d at 250 ("Silence or passive conduct of the defendant is not deemed fraudulent, unless the relationship of the parties imposes a duty upon the defendant to make disclosure."). Thus, presuming without deciding that the facts here support passive concealment, Thorman can prevail only if American Seafoods owed him a fiduciary duty to disclose its internal pricing/accounting methodologies.

Despite a "long line of cases that describe seamen as 'wards of the court' needing special protections from potentially overreaching ship owners," *Fuller v. Golden Age Fisheries*, 14 F.3d 1405, 1408 (9th Cir. 1994), the scope of these special protections is not unlimited and nothing supports Thorman's effort to invoke a fiduciary duty that requires American Seafoods to disclose its specific pricing methodology.

**[7]** Notably, we reserve our highest scrutiny for agreements under which a seaman releases the vessel owner of liability because of the understandable concern that such releases may leave the seamen devoid of legal redress. As the Supreme Court explained in a case involving a seaman's release, "The analogy . . . between seamen's contracts and those of fiduciaries and beneficiaries remains, under the prevailing rule treating seamen as wards of admiralty, a close one." *Garrett v. Moore-McCormack Co.*, 317 U.S. 239, 247 (1942). In *Garrett*, the seaman released the shipowner of all responsibility after he was injured by a blow from the ship's hatch cover

while at sea. *Id.* at 240-41. Questioning the conditions under which the release was given, the Court held that "the burden is upon one who sets up a seaman's release to show that it was executed freely, without deception or coercion, and that it was made by the seaman with full understanding of his rights." *Id.* at 248. Following this lead, courts have applied heightened scrutiny to cases involving seamen's releases. *See, e.g.*, *Orsini v. O/S Seabrooke O.N.*, 247 F.3d 953, 958-59 (9th Cir. 2001) ("Applicable law requires that we scrutinize the validity of a seaman's release under principles of admiralty law analogous to the duty owed by a fiduciary to a beneficiary . . . ."). *But see Resner v. Arctic Orion Fisheries*, 83 F.3d 271, 274 (9th Cir. 1996) (explaining in a seaman's release case that "Arctic Orion was not obliged to explain the merits of [Resner's] claim to him or to send him to a lawyer").

**[8]** Courts have also recognized the perils of working aboard ships: "The physical conditions under which the seaman labors are extremely hazardous. He works on an unstable and often slippery surface, subject to extreme sea and weather conditions." *Cal. Home Brands, Inc. v. Ferreira*, 871 F.2d 830, 837 (9th Cir. 1989). And, in light of these perils, Congress created for seamen a statutory right of action for negligence against employers. *See id.* at 833 (noting passage of the Jones Act, 46 U.S.C. § 688, in 1920). Courts have described the "peculiar conditions" of seamen's employment as the basis for such "extraordinary remedies being made available to those who accept this calling." *Perkins v. Am. Elec. Power Fuel Supply, Inc.*, 246 F.3d 593, 597-98 (6th Cir. 2001) (citing *Paul v. United States*, 205 F.2d 38, 42 (3rd Cir. 1953)); *see also Chandris, Inc. v. Latsis*, 515 U.S. 347, 354-55 (1995) (explaining that the legal regime governing maritime injuries grew out of concerns that seamen "are by the peculiarity of their lives liable to sudden sickness from change of climate, exposure to perils, and exhausting labour") (quoting *Harden v. Gordon*, 11 F. Cas. 480, 485, 483 (No. 6,047) (CC Me. 1823)). The threats to a seaman's well-being extend beyond the natural perils of working on the high seas to include "the

rigorous discipline of the sea" under which "complaints to superior officers of unsafe working conditions not infrequently provoke harsh treatment." *Socony-Vacuum Oil Co. v. Smith*, 305 U.S. 424, 430 (1939). In short, "seamen are the wards of the admiralty . . . because of the special circumstances attending their calling." *Id.* at 431.

Here, we are not faced with a release or other claim arising from a physical injury or the perils of the sea, but rather an employment contract with economic terms that Thorman was free to accept or reject. Thorman argues that "[t]here is no basis for retreating from the *Garrett* court's holding that seamen are owed a fiduciary-like duty by their employers." Quite the opposite of "retreating," Thorman asks us to expand *Garrett* not only to encompass a full-blown fiduciary relationship —as opposed to "fiduciary-like"—but also to envelop aspects of the seaman-vessel owner relationship far beyond the release context. Under Thorman's theory, vessel owners would be required to open their financial records to the seamen and offer up a market and accounting analysis that would amount to a mini-Securities and Exchange Commission filing.

**[9]** We do not read the "wards of the vessel" doctrine as extending to detailed financial disclosure under the employment contract, particularly where, as here, the "posted price" is disclosed, it is acknowledged that the "posted price" may be higher or lower than the contract price, and the employer undertakes a contractual obligation to make a "good faith estimate" of market value. Put simply, no precedent supports Thorman's effort to expand a seaman's rights in a release or injury case to a fiduciary relationship that imposes an affirmative burden on maritime employers to explain their precise compensation methodology or to disclose their financial calculations of "posted prices" versus market value of the catch.

Nor does precedent from the greater employment law context support Thorman's argument, although we certainly recognize that seamen are no ordinary employees. *Cf.* 19 Richard

A. Lord, *Williston on Contracts* § 54.18 (4th ed. 2003) (explaining that employers owe employees "two basic duties": (1) compensation in accordance with their agreement and indemnification for certain losses and (2) a safe workplace). Instead, fiduciary duties in the employer-employee relationship are limited to discrete, well-defined obligations. We have held, for example, that an employer acts in a fiduciary capacity when so required by federal law. *See, e.g.*, *Bins v. Exxon Co., U.S.A.*, 220 F.3d 1042, 1047-48 (9th Cir. 2000) (en banc) (discussing fiduciary duties under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.*). And, in certain circumstances, fiduciary-like duties run in the opposite direction with, for instance, the employee owing a duty of loyalty to the employer. *See, e.g.*, *Eckard Brandes, Inc. v. Riley*, 338 F.3d 1082, 1085 (9th Cir. 2003) ("It is clear under Hawaii law that employees owe their employer a duty of loyalty."). Thorman does not cite, nor have we uncovered, any precedent requiring vessel owners to detail their internal wage calculations to employees especially where, as is the case here, the employee has never asked and the confines of the calculated wages are set out in a contract.

Given the centuries of admiralty cases—including numerous cases involving seamen's wage claims, *see, e.g.*, *Oliver v. Alexander*, 31 U.S. 143, 145 (1832) ("The present is a case of seamen's wages, in which there is necessarily a several and distinct contract with each seaman, for the voyage, at his own rate of wages . . . ."); *Putnam v. Lower*, 236 F.2d 561, 570 (9th Cir. 1956) ("The jurisdiction of courts of admiralty over the wage claims of seamen is anciently established.")—the dearth of cases supporting Thorman's call for a newly minted fiduciary duty is telling. Unlike with trustee-beneficiary, *see, e.g.*, *N.L.R.B. v. Amax Coal Co.*, 453 U.S. 322, 329 (1981) ("[A] trustee bears an unwavering duty of complete loyalty to the beneficiary of the trust, to the exclusion of the interests of all other parties . . . ."), corporation-shareholder, *see, e.g.*, *United States v. Rodrigues*, 229 F.3d 842, 846 (9th Cir. 2000) ("[A] corporate fiduciary, such as a director, officer, or con-

trolling shareholder, may not usurp the corporation's business opportunities without proper consent."), and other typical fiduciary relationships in which there are countless cases discussing the duties imposed by common law, there is a legal black hole with regard to any requirement that maritime employers disclose their precise compensation methodology to seamen.

Finally, we view as significant the fact that both the courts and Congress have recognized time limits on seamen's wage claims and that Congress has set up a statutory scheme to protect seamen through written contracts. *See Fuller*, 14 F.3d at 1409 (upholding six-month limits on claims in similar fishing contracts and noting that the limitation period "was not unfair or unreasonable."); 46 U.S.C. § 10602(a) (six-month limitation on in rem actions). As we have explained, "the statutory scheme [requiring written contracts for fishermen] also benefits the vigilant employer. A fishing vessel that complies with the statutory requirements is protected by a six-month statute of limitations on in rem claims. This benefit is the quid pro quo for giving the seafarer a written contract." *Harper v. U.S. Seafoods LP*, 278 F.3d 971, 977 (9th Cir. 2002) (internal citations omitted). Congress further legislated that when an in rem action is brought, the "[vessel] owner shall produce an accounting of the sale and division of proceeds under the [fisherman's wage] agreement." 46 U.S.C. § 10602(b)(1). This accounting requirement is not an implied affirmative duty owed to seamen, but rather a statutory remedy that must be requested by a seaman as part of a legal action. Our decision today does nothing to undermine these statutory and contractual claims against the vessel or its owner, nor do we in any way dilute the well-established duties owed to seamen as "wards of admiralty."

**[10]** Considering these bounds placed on the solicitude owed by courts to seamen, we decline to impose an unprecedented fiduciary duty on vessel owners to disclose their internal pricing/accounting methodologies. Nothing in our

precedent or the legislative scheme protecting seamen supports such an extension. Although we reject the imposition of a fiduciary duty in this context, we underscore that vessel owners remain bound by the general duty "to act in good faith and to deal fairly in performing and enforcing the contract[s]." *Flores*, 335 F.3d at 913. Whether American Seafoods did so here, however, goes to the merits of the case, not to the threshold time-bar issue before us in this appeal.

**AFFIRMED**. The seals on all briefs and excerpts of record are **REMOVED** and **RELEASED**.

---

FERGUSON, Circuit Judge, concurring:

I agree that Thorman's claims are time-barred. He has neither proven fraudulent concealment nor established a fiduciary duty on the part of American Seafoods. The result may have been different if Thorman had adequately demonstrated that American Seafoods overstated its sales expenses in bad faith when it calculated the value of the fish the seamen caught. While ship owners such as American Seafoods may not owe a fiduciary duty to their seamen to disclose their internal pricing methodologies, they certainly owe a duty "to act in good faith and to deal fairly in performing and enforcing contract[s]." *Flores v. American Seafoods Co.*, 335 F.3d 904, 913 (9th Cir. 2003).