REINHARDT, Circuit Judge,
dissenting.
The majority allows a maritime employer to exploit the ignorance of an injured seaman and avoid paying him the compensation to which he is entitled under federal law, although for untold years it has been the policy of admiralty law to protect all seamen against this very type of willful exploitation. Icicle Seafoods advised Huseman and other seamen, in their Terms of Employment and in the Employee Handbook, that if they were to be injured, their benefits would be paid by Alaska Workers’ Compensation, and Icicle would coordinate any other benefits to which they were entitled under federal maritime law. It did this knowing that under federal maritime law it is responsible for paying maintenance and cure to its injured employees and is liable to suit under the Jones Act and under the doctrine of unseaworthiness. Then, when Huseman was injured, Icicle filled out Alaska Workers’ Compensation paperwork for him and gave him the names and phone numbers of people to contact regarding the Alaska Workers’ Compensation claim. It did not mention, however, that it was required to provide more generous compensation under federal law and certainly did nothing to coordinate the federal benefits or protect Huseman’s legal rights. Icicle Seafood’s whole pattern of behavior was designed to lull Huseman into a false sense of security, making him believe that, as his employer, it was looking out for him because it was taking care of all of his claims, a belief that Icicle hoped would last until the statute of limitations ran on the federal claims. Then, when Huseman came to Icicle a few months after the statute of limitations ran, and asked it to pay him what he was due, as it had promised to do in his Terms of Employment, Icicle, having succeeded in its objective, refused, relying on the statute of limitations and the doctrine of laches as defenses.
Such conduct by an employer should disturb jurists in any context. It is particu *1128 larly troubling, however, that the majority, contrary to hundreds of years of jurisprudence, approves the treatment of an “untutored” seaman in such a deceptive, harsh, and inequitable manner. Seamen are “no ordinary employees.” Thorman v. American Seafoods Co., 421 F.3d 1090, 1098 (9th Cir.2005). They receive special protection because they are “exposed to the perils of the sea,” are “often vulnerable to the exploitation of [their] employer,” and “there exists a great inequality of bargaining position between large ship owners and unsophisticated seamen.” Chandris v. Latsis, 515 U.S. 347, 354, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995); Fuller v. Golden Age Fisheries, 14 F.3d 1405, 1408 (9th Cir.1994) (internal quotation marks omitted). Shipowners’ special obligations toward seamen were established in many seafaring countries by the time of the Eighteenth Century. Michael J. Cerniglia, Is it Time to Cure the Doctrine of Maintenance and Cure?, 4 Loy. Mar. L.J. 67, 71 (2005). Justice Story, in Harden v. Gordon, 11 F.Cas. 480 (1823), noted that such special protections had “received the approbation of continental Europe,” and the famed justice then incorporated into United States common law the protections established by British common law, as well as those established by widely shared statutory provisions. Id. at 483. Since Justice Story’s decision, a long line of eases continues to treat seamen as “wards of the court needing special protections from potentially overreaching ship owners” like Icicle. Fuller v. Golden Age Fisheries, 14 F.3d 1405, 1408 (9th Cir.1994) (internal quotation marks omitted); Dragich v. Strika, 309 F.2d 161, 163 (9th Cir.1962).
The well-established special protections afforded seamen require equitable estop-pel, and possibly equitable tolling, of Huse-man’s Jones Act and unseaworthiness claims. They also preclude the application of laches to his maintenance and cure claim. The majority’s decision allowing shipowners to exploit the ignorance of trusting seamen stands in sharp conflict with centuries of precedent and undermines the longstanding protections afforded these vulnerable workers. Because, like Justice Story, “I am not bold enough to desert the steady light of maritime jurisprudence,” I dissent. Harden, 11 F.Cas. at 483.
I. Special Protections Due to Seamen — Equitable Estoppel in General
The special protections that the majority purports to acknowledge but then wholly disregards place additional burdens on shipowners to inform and provide for the seamen they employ. When shipowners fail to do so, courts are required to step in and protect their “wards.” In this case, contrary to the majority’s assertion, the protections due seamen require the application of equitable estoppel to Huseman’s Jones Act and unseaworthiness claims.[1]
The Supreme Court has declared that courts should “avoid, within reasonable limits, the application of rules of the common law which would affect [seamen] harshly because of the special circumstances surrounding their calling.” Socony-Vacuum Oil Co. v. Smith, 305 U.S. 424, 431, 59 S.Ct. 262, 83 L.Ed. 265 (1939). Any “ambiguities or doubts are resolved in favor of the seaman.” Vaughan v. Atkinson, 369 U.S. 527, 532, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962). In no area do seamen *1129 get more protection than in the context of recovery for injuries. Thorman, 421 F.3d at 1097. Courts have repeatedly interpreted the law to prevent “ship owner[s] from delegating, shifting or escaping [their] duty toward injured employees.” Waldron v. Moore-McCormack Lines, Inc., 386 U.S. 724, 728, 87 S.Ct. 1410, 18 L.Ed.2d 482 (1967).
For this reason, the Supreme Court has determined that the Jones Act and other “remedial legislation for the benefit and protection of seamen” must be “liberally construed” to avoid the harsh application of the law. Socony-Vacuum Oil Co. v. Smith, 305 U.S. 424, 431, 59 S.Ct. 262, 83 L.Ed. 265 (1939). Specifically, the Court has explained that the applicable statute of limitations under the Jones Act “is not totally inflexible, but, under appropriate circumstances, it may be extended beyond three years.” Burnett v. New York Cent. R.R. Co., 380 U.S. 424, 427, 85 S.Ct. 1050, 13 L.Ed.2d 941 (1965).[2] Extensions of the time limits for Jones Act and unseaworthiness claims are appropriate where the “congressional purpose is effectuated by tolling the statute of limitations in given circumstances.” Id. That purpose, “to afford[ ] adequate protection to seamen through an exaction of a high degree of responsibility of owners” would be furthered by estopping the shipowner from using the statute of limitations as a defense where it failed to inform a seaman of his legal rights. Socony-Vacuum Oil Co., 305 U.S. at 432, 59 S.Ct. 262.
Equitable estoppel is particularly appropriate here because, at least until the majority’s opinion in this case, shipowners had an obligation to inform injured seamen of their legal rights. Courts consistently recognized a fiduciary duty owed the seamen by the shipowner that places the burden upon the latter to insure that an injured seaman acts with a “full understanding of his rights.” Orsini v. O/S Seabrooke O.N., 247 F.3d 953, 959 (9th Cir.2001). The court in Orsini observed,
Where an injured seaman is not represented by counsel, it is the owner’s obligation to make a ‘full, fair and complete disclosure as to all of [a seaman’s] rights, including his right to sue for damages under the Jones Act, and his right to wages, maintenance and cure under the applicable Seamen’s Law.’
Id. at 964 (citation omitted). Accordingly, contrary to the majority’s unsupported assertion, shipowners do have the duty to act as “legal advisors to their [injured] employees.” Maj. op. at 1118-19. Where such a duty exists, “passive concealment,” meaning “mere nondisclosure or silence,” is sufficient to estop the party with the duty from enforcing the statute of limitations. Thorman, 421 F.3d at 1096; United States v. Colton, 231 F.3d 890, 899 (4th Cir.2000) (defining passive concealment).
It is clear that, under Orsini, Icicle is equitably estopped from raising the statute of limitations as a defense against Huse-man’s unseaworthiness and Jones Act claims. Like the plaintiff in Orsini, Huse-man was not represented by counsel. Orsini, 247 F.3d at 964-65. Nor was he “informed of even his basic entitlements.” Id. at 964. He had no idea that he was eligible for damages under the Jones Act or the unseaworthiness doctrine. Because of this ignorance, he received only the lesser remedy of workers’ compensation. It is undisputed that Icicle passively concealed his federal claims. At oral argu *1130 ment, Icicle acknowledged that no one at the company ever suggested to Huseman that he might have Jones Act or unseaworthiness claims. Thus, under Orsini, Icicle’s passive concealment of Huseman’s federal rights is sufficient to warrant equitable estoppel.
The majority attempts to distinguish Or-sini on the ground that it involves a release, suggesting that the special duty to inform applies in injury cases involving releases because of the inequality of bargaining power between seamen and shipowners, but that no such duty applies in injury cases in which a release is not at issue. However, Thorman rejects the notion that special protections apply only in cases involving releases, and determines instead, in accordance with the longstanding common law rule, that the doctrine applies in all cases involving injuries to seamen. Thorman states that “a release or other claim arising from a physical injury or the perils of the sea,” warrants application of “special protections.” 421 F.3d at 1097 (distinguishing “a release or other claim arising from a physical injury or the perils of the sea,” which necessitates application of “special protections,” from claims relating to employment contracts, which do not) (emphasis added). As Thor-man puts it, the special protections apply “in a release or injury case,” not, as the majority here would have it, only in cases involving both a release and an injury. Huseman’s Jones Act and unseaworthiness claims “aris[e] from a physical injury,” and so, under Thorman, Huseman is entitled to the special protections afforded injured seamen.
Our previous cases, by expressing concern with any occurrence that “leave[s] the seamen devoid of legal redress,” also preclude the majority’s attempt to differentiate between injury claims involving releases and other injury claims. Thorman, 421 F.3d at 1096. Because of this concern, courts “have given liberal interpretation to [shipowners’] obligation[s] in the personal injury context” and have said that the obligations of a shipowner to an injured seaman “should not be hampered by restrictive distinctions which would defeat its broad beneficial purposes.” Dragich v. Strika, 309 F.2d 161, 163 (9th Cir.1962) (holding that the shipowner was obligated to provide maintenance and cure to a seaman whose pre-existing Parkinsons disease first manifested itself while at sea); see also Waldron v. Moore-McCormack Lines, Inc., 386 U.S. 724, 726-27, 87 S.Ct. 1410, 18 L.Ed.2d 482 (1967) (expanding the definition of “unseaworthy” to include instances in which an insufficient number of men are assigned to a particular task). If differentiating between injuries caused by the shipowner and pre-existing illnesses unrelated to employment is a “restrictive distinction” that would defeat the purpose of federal benefits, it is difficult to justify distinguishing between releases and other mechanisms that cause seamen to fail to exercise their rights. Accordingly, contrary to the majority’s assertion that Huseman’s employer was under no obligation to advise him of his federal claims, this court’s precedent requires that Icicle “make a full, fair and complete disclosure as to all of [Huseman’s] rights, including his right to sue for damages under the Jones Act, and his right to wages, maintenance and cure under the applicable Seaman’s laws.” Orsini, 247 F.3d at 964 (internal quotation marks omitted).
It is particularly apparent that such a disclosure was required in this case because Icicle affirmatively advised Huseman that it would coordinate his federal benefits and did not mention any exceptions or requirements. At the very least, having made these assurances, Icicle should have told Huseman which claims they would coordinate and which, if any, he was re *1131 quired to handle himself. By giving Huse-man false assurances instead of information, Icicle encouraged him to forego his rights and accept less generous benefits than he would otherwise have received, just as happened in Orsini Under Orsi-ni, even if shipowners did not always have a duty to inform injured seamen of their rights, when a shipowner falsely assures an employee that it will take care of all of his claims resulting from any injury, and as a result he abandons his rights as effectively as if he had signed a formal release, the rules regarding special protections apply-
Even under the majority’s own test, which limits the special protections due seamen to occurrences linked to the policy reasons for their creation, these protections would apply here. The ward of the court doctrine exists, in part, because seamen are too “poor, friendless, and improvident” to assert their rights. Vaughan, 369 U.S. at 531, 82 S.Ct. 997. It also exists “because they are by the peculiarity of their lives liable to sudden sickness from change of climate, exposure to perils, and exhausting labor.” Chandris v. Latsis, 515 U.S. 347, 354-55, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995). These conditions created the need for the Jones Act and the unseaworthiness doctrine, as well as for the special protections that ease recovery for seamen, in order to “compensate] or offset[ ] the special hazards and disadvantages to which they who go down to the sea in ships are subjected.” Id; see also Thorman, 421 F.3d at 1097 (“[T]he peculiar conditions of seamen’s employment [are] the basis for such extraordinary remedies being made available to those who accept this calling.” (internal quotations omitted)). Huseman’s injury was the result of his “exhausting labor.” Chandris, 515 U.S. at 354-55, 115 S.Ct. 2172. He failed to file suit earlier because of his ignorance. The ward of the court doctrine exists to protect the rights of workers like Huseman under precisely these circumstances. Thus, application of the doctrine here is directly linked to the policy reasons justifying its creation.
Faced with this longstanding law, the majority attempts to rely on language in Thorman regarding the level of scrutiny applied to releases. Maj. op. at 1125. This case, however, is not about the level of scrutiny. It is about the ward of the court doctrine and the fiduciary duty shipowners owe to injured seamen, which, the Thorman court determined, apply to Jones Act and unseaworthiness claims. Thorman, 421 F.3d at 1097.
Perhaps the majority’s inexplicable hostility to the legal protections due injured seamen derives in part from a mistaken belief that seamen are no longer the “ignorant and helpless” men of old. Johnson v. Offshore Tankers Svc. Inc., 789 F.2d 1417, 1419 (9th Cir.1986). However, the Supreme Court reaffirmed the ward of the court doctrine only a decade ago and the Ninth Circuit did so even more recently. Chandris v. Latsis, 515 U.S. 347, 354, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995); Orsini, 247 F.3d at 959. Huseman’s Terms of Employment also demonstrates that seamen continue to be “poor, friendless, and improvident,” with limited access to information. Vaughan, 369 U.S. at 531, 82 S.Ct. 997. It informed Huseman that during busy periods he could expect to work 16 hours or more per day under “cold, drafty, and wet” conditions for a starting salary of only $6.00 per hour. He was not allowed to have subscriptions to newspapers or magazines sent to the ship. Nor would there have been much space for books in the one duffel bag and one small carry-on he was allowed to bring on the ship, in which he had to pack everything (including soap and cigarettes) needed for a trip of indefinite duration. Accordingly, *1132 even as of today, the record gives no cause to suspect that the reasons for affording special protections to injured seamen no longer prevail.
Thus, shipowners are required to continue to inform injured seamen of their rights, especially when they take responsibility for handling injury claims. Because Icicle failed to inform Huseman of his federal rights, or otherwise help protect him against the forfeiture of his rights, I would hold that it is equitably estopped from invoking the statute of limitations as a defense to his Jones Act and unseaworthiness claims.
II. Equitable Estoppel Due to Affirmative Misconduct
Even if the majority were correct that shipowners do not generally have a fiduciary duty to inform injured seamen of their federal rights, equitable estoppel would still apply with respect to Huseman’s Jones Act and unseaworthiness claims. Absent a fiduciary duty, equitable estoppel applies where (1) the plaintiff reasonably relies on the defendant, (2) there is evidence of “the defendant’s actual or constructive knowledge of the deceptive nature of its conduct,” and (3) the purpose of the limitations period would be satisfied. Santa Maria v. Pac. Bell, 202 F.3d 1170, 1176 (9th Cir.2000). “[Cjonduct or representations by the defendant-employer which tend to lull the plaintiff into a false sense of security can estop the defendant from raising the statute of limitations.” Atkins v. Union Pac. R.R. Co., 685 F.2d 1146, 1149 (9th Cir.1982) (finding that equitable estoppel applied where the defendant told the plaintiff it would settle but delayed doing so until after the statute of limitations ran if “the defendant knew or suspected that [the plaintiff] was unrepresented; if it knew or suspected that he had a limited ability to protect his own interests; and if [the plaintiff] relied on the [defendant’s] assurances that [it] would settle the claim”).
Icicle lulled Huseman into a false sense of security by assuring him that it would take care of his benefits and by acting as if it were doing so. Icicle first took steps to lull Huseman by giving him the Terms of Employment, which states,
If you are injured while working on the floating processor, it may be covered under Alaska Worker’s Compensation and/or under Federal Maritime benefits. Unless requested otherwise, we will process any claim through the Alaska Workers’ Compensation system and coordinate any additional benefits that may be due under Federal Maritime Law; however, you may request at any time to opt out of the Alaska Worker’s Compensation system in favor of Federal benefits.
This clause suggests that, should an employee become injured, Icicle will take care of everything and ensure that he will receive everything he is due. Icicle promised to do this automatically, with no effort on the part of the injured seaman, “unless requested otherwise.” The clause does not define or limit the federal benefits that Icicle will coordinate, implying, at least to someone without sophisticated legal training, that Icicle would coordinate all federal claims. The clause further suggests that there are no deadlines that the seaman needs to worry about since he is free to change his benefits “at any time.”
Even though Huseman did not remember the clause, his review of the Terms of Employment would undoubtedly have left him with the impression that he did not need to worry about medical bills and that there was nothing he was required to remember in order to receive all to which he was entitled. Icicle would take care of everything, and if he was unsatisfied at *1133 any time it would not be too late to change. In fact, Huseman may ivell have forgotten aboitt the disputed clause precisely because of these misleading assurances.[3]
Huseman’s false sense of security was no doubt reinforced by Icicle’s post-injury conduct. This conduct created the impression that Icicle was taking care of Huse-man and that workers’ compensation was his only remedy. Immediately following his injury, Icicle “directed” him to state workers’ compensation. Icicle filled out much of the form. It sent him to a physician’s assistant who also filled out workers’ compensation paperwork, although Huse-man did not ask him to do so. Icicle then mailed the workers’ compensation paperwork on his behalf and gave him a list of people to contact regarding his workers’ compensation claim. Throughout all this time, Icicle made no mention of the federal rights or benefits to which he was entitled.
Not only did Icicle lull Huseman into a false sense of security, it seems to have actively tried to keep its employees in the dark about their federal rights. For example, even though shipowners are required by federal law to provide maintenance and cure to any seaman who becomes ill for any reason, the Terms of Employment twice suggests that such bills must be paid by the seamen. It states, for example, “If you must leave the floating processor for medical care that is not job related, transportation and clinic expenses will be charged to you without your approval.” This is so obviously inaccurate that it suggests intentional misconduct on the part of Icicle. It is unlikely that Icicle would inform its employees that they would be billed for expenses that it is required to pay unless it was attempting to hide information from them about their entitlement to federal benefits in order to avoid paying them those benefits.
Huseman’s employment brochure was also written so as to direct his attention to workers’ compensation, rather than federal benefits, as his remedy in case of injury. The brochure states, “All employees have withheld from their wages amounts specified by federal and state law and, accordingly, are covered by Worker’s Compensation, Social Security, Unemployment Compensation, and other benefits prescribed by law.” Mr. Huseman reasonably understood this provision to mean that money was deducted from his paycheck for workers’ compensation, and that workers’ compensation would cover him if he were injured. In fact, no money was taken out of Huseman’s paycheck for workers’ compensation, and he had superi- or benefits under federal law. Even assuming that Icicle was under no obligation to inform Huseman of his benefits, this clause is illustrative of Icicle’s pattern of taking advantage of its employees’ ignorance by directing their attention to workers’ compensation to the exclusion of the more costly federal benefits. At the very least, Icicle should have been aware that the information it provided Huseman was misleading, which is all that Pacific Bell requires.
The majority incomprehensibly reads the Terms of Employment as saying that Huseman must opt out of his Alaska benefits before Icicle will coordinate his federal benefits. The majority asserts that the promise to coordinate benefits in the Terms of Employment exists “to inform *1134 Huseman that at any time he was receiving Alaska Workers’ Compensation, he was free to choose instead the federal benefits. If such federal benefits were greater than those under Alaska Workers’ Compensation, Icicle would pay the difference.” Maj. op. at 1123-24. This reading appears to be entirely a concoction of the majority’s. It is wholly unsupported by the text, which would suggest precisely the opposite, even to a well-educated lawyer. By first saying that an injured seaman “may be covered under Alaska Worker’s Compensation and / or under Federal Maritime Benefits” and then adding that “we will process any claim through the Alaska Workers’ Compensation system and coordinate any additional benefits that may be due under Federal Maritime Law,” Icicle committed to both processing the workers’ compensation claim and coordinating additional federal benefits. Nowhere does the provision state that Huseman must take affirmative action in order to “pursue federal remedies.” Rather, the clause states that Huseman may be covered under both and that coordination will occur unless Huseman requests otherwise. Nor does the paragraph suggest that he must chose between the two, or opt out of one set of benefits in order to receive the other. By promising to “coordinate any additional benefits” then, Icicle promised to “disclose, file, or process any federal claims.” Maj. op. at 1124.
The fact that the provision also states, “however, you may request at any time to opt out of the Alaska Workers’ Compensation system in favor of Federal benefits” does not change the meaning of the key phrase, “additional.” It suggests only that, instead of receiving state and federal benefits, coordinated by Icicle, the employee may elect to receive only federal benefits. What the relative advantages and disadvantages of such an option may appear to be to an impecunious seaman remains wholly unexplained. Under such circumstances, the untutored seaman would most likely assume that he would be better off receiving both state and federal benefits, rather than just receiving federal benefits. Even a highly educated individual might reasonably expect that more benefits would mean more money, or at least would not mean less money.
The majority, however, adheres to its tortured reading of the clause in spite of our precedent mandating that, in resolving such questions, the interpretation most beneficial to the seaman must be adopted. See Medina v. Erickson, 226 F.2d 475, 479 (9th Cir.1955). In holding uneducated seamen to a standard that most large firm corporate partners would not meet, the majority leaves employers free to make misleading statements that obfuscate their employees’ legal rights, prevent them from filing suit, and then escape liability by arguing before this court that the statements must be interpreted in a way that cannot possibly have been understood by the untutored seaman. Even if the employer had no general duty to inform injured seamen of their rights, it would be responsible for the consequences of its confusing and misleading statements. Thus, there is no basis for reading the Terms of Employment as anything other than what it would appear to be to Huse-man: a promise to take care of all his potential rights to recovery should he suffer injury in the course of his employment.
The majority also asserts that Huseman cannot establish that he reasonably relied on Icicle. It argues that he could not have relied on its misrepresentations in the Terms of Employment because he did not remember the terms of the clause in the Terms of Employment that was relevant to his claim. It concludes that he cannot show reasonable reliance without the Terms of Employment since Icicle’s assis *1135 tance with the workers’ compensation claim was not, by itself, enough to make reliance on Icicle reasonable. However, as explained above, the fact that Huseman did not remember the clause does not mean that he did not rely on it. See supra, p. 1133. Nor is there any doubt that Huseman relied on Icicle. There is ample evidence in the record, some quoted by the majority, demonstrating Huseman’s actual reliance on Icicle’s general conduct. Huseman testified that Icicle “said they’d fix it all up for me, so I had no reason not to trust them.He also explained that “[ejverything Icicle did was tell me I had a workmen’s comp claim and here’s the forms and here’s the people to call ... Now I think it’s misleading, and I was trusting them.”
In sum, Huseman has established the elements necessary for equitable estóppel. He reasonably relied on Icicle, and Icicle’s conduct lulled him into a false sense of security. Icicle promised to take care of all of his potential claims, and appeared to him to be doing so, causing him not to pursue his legal entitlements on his own and file a lawsuit earlier. The evidence strongly suggests that Icicle’s conduct was intentional, but even if it had not been, its statements were so obviously misleading that it should, unquestionably, have been aware of their deceptive nature. For these reasons, Icicle is estopped from relying on the statute of limitations as a defense against Huseman’s Jones Act and unseaworthiness claims.
III. Equitable Tolling
Because I conclude that equitable estop-pel applies, I need not reach the question of equitable tolling, although I think it likely that Huseman would prevail on that theory as well. I do note, however, that the majority misrepresents the Alaska Worker’s Compensation brochure when it states that Huseman should have known that he had an obligation to inquire about his federal claims. That brochure, titled “Workers’ Compensation and You,” includes a section labeled “Coverage” which reads:
Nearly all Alaska employees are covered. Commercial fishers are an exception, but some fish processor workers on floating processing vessels are covered. Other exceptions are contract entertainers, some taxicab drivers, part-time babysitters, some cleaning persons, some participants in the Alaska temporary assistance program, some sports officials, harvest help and similar part-time or temporary workers. Most unpaid volunteers are not covered, but some volunteer ambulance attendants, volunteer fire fighters and police officers, volunteer emergency medical technicians, and volunteer civil defense or disaster workers are covered. Sole owners and partners of businesses and executive officers of non-profit corporations are not covered but may choose to buy coverage. Executive officers of corporations-for-profit are covered but may choose to waive coverage. Although federal employees and most maritime workers are not covered under Alaska law, they may be covered under federal law. If you want to know whether you are covered, contact the Division.
By quoting only the last two sentences, the majority creates the impression that the Alaska Workers’ Compensation Division offered information about benefits under federal law. The complete passage, however, makes it clear that the Alaska Workers’ Compensation Division answers questions about eligibility for Alaska benefits. As the passage offers advice regarding Alaska benefits only, there was no reason for Huseman to contact the Alaska Workers’ Compensation Division. He already knew that he was eligible for Alaska *1136 Workers’ Compensation because he was already getting benefits. Nor does anything in the Alaska Workers’ Compensation brochure indicate that injured workers may have remedies under both Alaska Workers’ Compensation and federal law. Instead, federal benefits are mentioned as covering some people not covered by state law. Even if it were possible to construe the language in the passage as offering advice regarding federal benefits, given its placement in the “Coverage” section of a brochure completely devoted to workers’ compensation the most reasonable construction is that it offers information only regarding workers’ compensation. Thus, nothing in the brochure should have made anyone, let alone an “ignorant” and “helpless” seaman like Huseman, aware of his federal benefits when, he was already receiving workers’ compensation.
IV. Laches
Had the majority reached the correct outcome on equitable estoppel, it would have been unnecessary for it to remand the maintenance and cure claim to the district court to determine whether laches should apply. The affirmative defense of laches “requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.” Jarrow Formulas, Inc. v. Nutrition Now, Inc., 304 F.3d 829, 838 (9th Cir.2002). Icicle cannot show either element of its laches defense.
First, Icicle cannot demonstrate a lack of diligence on Huseman’s part. As explained above, Huseman reasonably relied on Icicle to coordinate any federal claims available to him. He filed this lawsuit only eleven days after he discovered that he had federal claims and that Icicle was not coordinating those claims as promised.
Second, Icicle cannot demonstrate that it was prejudiced by the delay. As explained above, Icicle failed to perform its fiduciary duty of informing Huseman of his rights, thereby delaying the litigation. It likewise delayed the litigation by lulling Huseman into a false sense of security and thereby discouraging him from filing suit. Because any delay in this litigation was of Icicle’s own creation, Icicle cannot claim that it was prejudiced by Huseman’s delay.
Thus, because Icicle cannot establish either element of its laches defense, I see no need to remand the maintenance and cure claim. Rather, I would hold Icicle cannot rely on laches as a defense against that claim.
V. Conclusion
In light of the special protections due injured seamen, Huseman has shown that equitable estoppel applies with respect to his Jones Act and unseaworthiness claims. The same factors demonstrate that there is no justification for the district court’s application of the doctrine of laches to the maintenance and cure claim. A remand on that issue is unnecessary. Reversal is required as to all three claims. In reaching the contrary conclusion, the majority disregards centuries of maritime jurisprudence and undermines the ward of the court doctrine. I dissent.

. Because maintenance and cure is an equitable remedy, the doctrine of laches governs, rather than a statute of limitations. Much of the analysis in this Section, and in Sections II and III, is applicable, however, to Icicle's attempt to invoke laches and ultimately defeats this defense.

. Although Burnett addressed the Federal Employers Liability Act (“FELA”), the Supreme Court has held that the "Jones Act adopts the entire judicially developed doctrine of liability under [FELA].” American Dredging Co. v. Miller, 510 U.S. 443, 455-56, 114 S.Ct. 981, 127 L.Ed.2d 285 (1994).

. The majority attacks this inference because it is not compelled by the record. In doing so, it disregards the well-established rule that on summary judgment we must make all justifiable inferences in favor of the nonmoving party. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).