# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LANNY M. HUSEMAN,
    *Plaintiff-Appellant,*

  v.

ICICLE SEAFOODS, INC., a
Washington corporation; F/V
DISCOVERY STAR, Official No.
500072, her engines, tackle,
furniture, apparel and equipment,
In Rem,
    *Defendants-Appellees.*

No. 04-35655

D.C. No.
CV-03-02786-RSL

OPINION

Appeal from the United States District Court
for the Western District of Washington
Robert S. Lasnik, District Judge, Presiding

Argued and Submitted
May 3, 2006—Seattle, Washington

Filed December 27, 2006

Before: Stephen Reinhardt, M. Margaret McKeown, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge McKeown;
Dissent by Judge Reinhardt

19901

**COUNSEL**

Eric Dickman, Injury at Sea, Seattle, Washington, for the appellant.

Philip W. Sanford and Daniel S. Potts, Holmes Weddle & Barcott, Seattle, Washington, for the appellees.

**OPINION**

McKEOWN, Circuit Judge:

Lanny Huseman appeals the district court's decision on summary judgment that his Jones Act, 46 App. U.S.C. § 688, and unseaworthiness claims against Icicle Seafoods, Inc. ("Icicle") were time-barred and that his maintenance and cure claim was barred by laches. As to the Jones Act and unseaworthiness claims, Huseman does not dispute that his filing was untimely and beyond the three year limitations period. Instead, he argues that he should be allowed to proceed under the theories of equitable tolling or equitable estoppel.

Given the circumstances of this case, Huseman cannot establish the requirements for either equitable tolling or equitable estoppel. Huseman asks us to fashion, under the "wards

of the court" doctrine for seamen, a broad fiduciary duty that would require employers, like Icicle, to affirmatively disclose and explain federal causes of action, including Jones Act and unseaworthiness claims, to their employees. We are mindful of the special remedies and protections reserved for seamen because of the perils of the sea and the hard conditions of their labor; we decline however, to embrace such an unprecedented extension of the "wards of the court" doctrine. Although ship owners owe a duty "to act in good faith and to deal fairly in performing and enforcing . . . contract[s]," *Flores v. Am. Seafoods Co.*, 335 F.3d 904, 913 (9th Cir. 2003), these duties do not extend so far as to render ship owners legal advisors to their employees in all contexts. *Compare Orsini v. O.S. Seabrooke O.N.*, 247 F.3d 953, 964 (9th Cir. 2001) (shipowner is required to provide legal advice regarding the seaman's rights before seaman may sign a release of those rights).

As to the maintenance and cure claim, we agree with Huseman that the district court erred in its laches determination. Huseman filed suit within a month after learning of his potential claim and less than six months after the three year limitations period for the other claims expired. The district court did not, as required by our case law, make specific findings of prejudice to support the laches bar and did not balance any prejudice against the short duration of the delay and Huseman's justification.

We therefore affirm the district court's dismissal of Huseman's Jones Act and unseaworthiness claims, and reverse and remand on his maintenance and cure claim. This result does not, as the dissent suggests, leave the seaman devoid of legal redress, nor does it foreclose the invocation of equitable estoppel or equitable tolling in the appropriate case. *See Thorman v. Am. Seafoods Co.*, 421 F.3d 1090, 1096 (9th Cir. 2005).

**BACKGROUND**

Sometime in March or April of 2000, Huseman injured his shoulder while working for Icicle aboard the Discovery Star. At the time of his hire as a seafood processor, Huseman received a document entitled "Terms of Employment," which included the following clause informing him about potential maritime benefits:

> If you are injured while working on the floating processor, it may be covered under Alaska Worker's [sic] Compensation and/or under Federal Maritime benefits. Unless requested otherwise, we will process any claim through the Alaska Workers' Compensation system and coordinate any additional benefits that may be due under Federal Maritime Law; however, you may request at any time to opt out of the Alaska Worker's Compensation system in favor of Federal benefits.

After learning of Huseman's injury, Icicle filed an Alaska Workers' Compensation Report with the Alaska Department of Labor, as required by Alaska law. *See* Alaska Stat. § 23.30.070 (1970). The Alaska Department of Labor then sent Huseman an explanatory pamphlet, which Huseman remembers receiving and reading. The pamphlet explains coverage and invites questions, stating that "[n]early all Alaska employees are covered. Commercial fishers are an exception, but some fish processor workers on floating processing vessels are covered." The pamphlet goes on to state that "[a]lthough federal employees and most maritime workers are not covered under Alaska law, they may be covered under federal law. If you want to know whether you are covered, contact the [Workers' Compensation] Division." Since his injury, Huseman has received continuous coverage by way of medical treatment and disability payments under the Alaska workers' compensation system. Huseman did not inquire about the availability of federal remedies, nor about his eligi-

bility for additional benefits beyond the workers' compensation benefits that he was already receiving.

Nearly three and one-half years after his injury, Huseman filed suit in federal court alleging federal maritime claims of negligence under the Jones Act, unseaworthiness, and maintenance and cure. Huseman was deposed and testified that he had received and read the Terms of Employment and the pamphlet from the Alaska Workers' Compensation Board, both of which included statements regarding potential federal remedies. Huseman said that he did not understand the reference to federal benefits, and further, that he had forgotten about those documents by the time of his injury. Significantly, Huseman acknowledged that no one at Icicle or the Alaska Workers' Compensation Board told him that he could not pursue federal claims, and that he never asked about the availability of federal remedies. Huseman testified that had he inquired, Icicle and the Alaska agency probably would have explained the federal claims to him.

Icicle filed a motion for summary judgment, arguing that Huseman's claims were barred on timeliness grounds. The district court granted the motion, finding that "(a) [Huseman] was unaware that seamen such as himself might have claims under the Jones Act and general maritime law, (b) [Icicle] did not advise him of that fact, and (c) [Huseman] made no effort to ascertain whether he had any remedy other than that afforded by the Alaska State Workers' Compensation Act." The district court also held that no one at Icicle misled Huseman regarding the availability of federal remedies. Instead, as the district court pointed out, Huseman based his argument on the Terms of Employment, claiming that the document was misleading. Because Huseman admitted that he did not understand the reference to federal benefits in the Terms of Employment and that he had completely forgotten about the reference by the time of his injury, the district court concluded that Huseman could not have relied on the Terms of Employment in filing his suit beyond the statute of limita-

tions. Accordingly, Huseman's Jones Act and unseaworthiness claims were time-barred.

With regard to maintenance and cure, the district court recognized that there is a dispute as to whether laches or the statute of limitations determined the timeliness of the claim. The district court did not decide the issue and instead held that the expiration of the statute of limitations brings a presumption that laches applies and that, absent good reason for an extension, the claim is barred. Because Huseman based his claim on ignorance of the law and his failure to inquire about the federal claims, the district court found his delay in filing unreasonable. Without further explanation, the district court also found that Icicle would be prejudiced by the late filing and held the maintenance and cure claim time-barred under laches.

## ANALYSIS

Typically, "[w]e review de novo a grant of summary judgment and must determine whether, viewing the evidence in the light most favorable to the nonmoving party, there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc). This is a case, however, in which "[t]he law of this Circuit is somewhat inconsistent regarding the standard of review applicable to a district court's determination of whether equitable estoppel or equitable tolling applies to a claim barred by the statute of limitations." *Johnson v. Henderson*, 314 F.3d 409, 413 (9th Cir. 2002). Generally, when—as here—the facts are undisputed, we review the district court's decision regarding equitable tolling de novo, and equitable estoppel for an abuse of discretion. *Id.* at 413-14; *Santa Maria v. Pac. Bell*, 202 F.3d 1170, 1175-76 (9th Cir. 2000).

Huseman's arguments for preserving his Jones Act and unseaworthiness claims rely on equitable tolling and equitable

estoppel. As we explain below, equitable tolling is not warranted because Huseman did not exercise due diligence in pursuing his federal claims. Huseman cannot take advantage of equitable estoppel because he did not (nor could he) reasonably rely on the disputed paragraph in the Terms of Employment or on Icicle's conduct in delaying his filing, since he concedes that he did not remember or refer to the Terms of Employment at the time of his injury. The dissent's attempt to impute reasonable reliance on the paragraph to Huseman is pure and unsupported speculation.

## I. EQUITABLE TOLLING

[1] Equitable tolling "focuses on whether there was excusable delay by the plaintiff" and "may be applied if, *despite all due diligence*, a plaintiff is unable to obtain vital information bearing on the existence of his claim." *Santa Maria*, 202 F.3d at 1178 (emphasis added); *see also Burnett v. New York Cent. R.R. Co.*, 380 U.S. 424, 429 (1965) (allowing equitable tolling if "a plaintiff has not slept on his rights, but rather, has been prevented from asserting them"). Huseman's equitable tolling claim, unlike his equitable estoppel claim, is founded on his conduct and due diligence. The absolute lack of any effort on his part to inquire about available options defeats his equitable tolling claim.

Huseman acknowledges that he made no effort to ascertain whether he had any remedy other than that afforded by the Alaska Workers' Compensation Act, despite opportunities to do so with Icicle and the Alaska Workers' Compensation Board:

> Q:               Have you ever talked to anyone at the Alaska Workers' Compensation Board about rights you might have, remedies you might have, entitlement to money or benefits outside of the Workers' Comp[ensation] Act?

Huseman:    No, never. . . . I assumed workers' comp[ensation] was all I've ever known my entire life.

. . .

Q:    Have you ever talked to anybody else, either on the boat or since you left the boat, about what a person does if they're injured working at sea?

Huseman:    No. The first time I ever heard anything different [from workers' compensation] is when I talked to [my attorney].

. . .

Q:    Did you ask [Icicle] any questions about whether or not you had any right to anything outside of workers' comp[ensation]?

Huseman:    No.

. . .

Q:    Did you ever talk to anybody at all about whether workers' compensation was the only place you could go to make a claim?

Huseman:    No, I didn't.

The pamphlet provided by the State of Alaska specifically invited inquiry to the Alaska Workers' Compensation Divi-

sion and at the end of the brochure had an additional section entitled, "If you still have questions."

**[2]** Huseman admits that he read the Terms of Employment, which stated that he could "request at any time to opt out of the Alaska Worker's Compensation system in favor of Federal benefits" and that Icicle would coordinate those federal maritime benefits, i.e., maintenance and cure. Huseman also admits doing nothing to inquire about the federal benefits or the possibility of other remedies, such as federal claims, i.e., Jones Act and unseaworthiness claims:

> Q:          "[H]aving read this [paragraph in your Terms of Employment] before you were injured, did you ever at any time, either before you were injured or after, make any inquiry, question anybody in any way, in writing or verbally, about what it meant to be covered under federal maritime benefits?
>
> Huseman:    No, I didn't.

**[3]** Huseman did nothing to inquire about the availability or extent of federal remedies and until just before filing suit after the limitations periods had expired, never inquired of anyone about the process and timing for invocation of federal benefits. Under these circumstances, Huseman has not shown the requisite due diligence for equitable tolling. *See Iturribarria v. INS*, 321 F.3d 889, 897 (9th Cir. 2003) (noting that due diligence is required to trigger equitable tolling).

## II.  EQUITABLE ESTOPPEL

**[4]** Equitable estoppel, sometimes called fraudulent concealment, "focuses primarily on the actions taken by the defendant in preventing a plaintiff from filing suit. . . .

[including] the plaintiff's actual and reasonable reliance on the defendant's conduct or representations." *Santa Maria*, 202 F.3d at 1176. For example, "conduct or representations by the defendant-employer which tend to lull the plaintiff into a false sense of security, can estop the defendant from raising the statute of limitations, on the general equitable principle that no man may take advantage of his own wrong." *Atkins v. Union Pac. R.R.*, 685 F.2d 1146, 1149 (9th Cir. 1982) (internal quotation marks and alterations omitted).

**[5]** Huseman candidly admits that no one told him that his only available benefits were through Alaska Workers' Compensation. He also acknowledges that if he had asked Icicle about the federal benefits mentioned in his Terms of Employment, he had no reason to believe that Icicle would have withheld such information from him:

Q: In all of your dealings with Icicle or any of its employees . . . regarding your injury, did anybody ever tell you you had a right only to workers' compensation?

Huseman: No.

Q: Did you ever read anything that said workers' compensation is your only right?

Huseman: No.

Q: Can you think of anything anybody told you, whether it be . . . any of the employees of Icicle, anybody you dealt with regarding your injury, can you think of anything anybody said that you felt misled you?

Huseman:       No, not really, no.

**[6]** Huseman instead points to the paragraph of the Terms of Employment, which states that Icicle will "coordinate any additional benefits that may be due under Federal Maritime Law" and that Huseman may "request at any time to opt out of the Alaska Worker's Compensation system in favor of Federal benefits." Significantly, at the time of his injury, Huseman had long since forgotten about this paragraph, and, regardless, claims not to have understood what it meant by the possibility of federal maritime benefits:

Q:             Now, what would it mean to you, when you read this, to be covered under federal maritime benefits?

Huseman:       That I don't know.

Q:             Did you ever ask?

Huseman:       No, uh-uh.

Q:             I mean, when you dealt with Icicle when you were injured, did you ever ask what it meant to be covered under federal maritime benefits?

Huseman:       No, I didn't.

. . .

Q:             So when it came about at some point that you were injured on the floating processor, did you make inquiry of somebody about what this means, this paragraph [in the Terms of Employment]?

Huseman:      No. I never even remembered that paragraph or anything about it.

Accordingly, Huseman cannot establish actual and reasonable reliance as required for equitable estoppel. *See Guerrero v. Gates*, 442 F.3d 697, 706-07 (9th Cir. 2006) (noting that for equitable estoppel, "[t]he plaintiff must demonstrate that he relied on the defendant's misconduct in failing to file in a timely manner and 'must plead with particularity the facts which give rise to the claim of fraudulent concealment' ") (quoting *Conerly v. Westinghouse Elec. Corp.*, 623 F.2d 117, 120 (9th Cir. 1980)).

Faced with this difficulty, Huseman argues that the paragraph in the Terms of Employment, along with Icicle's help in securing the Alaska Workers' Compensation benefits, lulled him into a false sense of security in which he assumed that Icicle had taken on the affirmative duty of securing any available federal claims and benefits:

Q:      Now, again, either before or after you were injured . . . did you ever make any inquiry about [the possibility of federal benefits] with anybody at Icicle . . ., anything like that?

Huseman:      No, uh-uh, because basically workmen's comp[ensation] was there to help me. They were there taking care of everything.

Q:      Okay. Did you ever get any explanation from anyone at Icicle . . . or anybody else about what it meant to opt out of Alaska Workers' Comp[ensation] in favor of federal benefits?

Huseman:      No. It never came up.

Q:              If it never came up, then I guess it
                never came up that anything was said
                that you felt was misleading?

Huseman:        Well, no. I don't think I was misled
                then because I was going to work-
                men's comp[ensation]. But I felt that
                they directed me there.

Q:              What do you mean they directed you
                there?

Huseman:        They gave me all the paperwork to
                set up a workmen's comp[ensation]
                claim. Now I think it's misleading,
                and I was trusting them.

The dissent suggests that the disputed paragraph in the Terms of Employment assured Huseman that he need not investigate further, and that Icicle would ensure that any and all monies due to him were received. This argument needs to be examined in the face of the evidence, not merely the dissent's speculative characterization. *See Guerrero*, 442 F.3d at 707 (to bring a successful equitable estoppel claim, the plaintiff must "plead with particularity . . . fraudulent behavior on the part of the defendants that would excuse his delay in bringing this suit"). It bears repeating that since Huseman had no recollection of the disputed paragraph in the Terms of Employment and never claimed that it was the basis for his inaction, it would be pure conjecture to conclude that that document is part of a legitimate claim that he was lulled into foregoing his federal rights.

Nonetheless, it is worth examining the paragraph. As explained by Icicle, the purpose of including the statement that Icicle would "coordinate any additional benefits that may be due under Federal Maritime Law" was to inform Huseman that at any time he was receiving Alaska Workers' Compen-

sation, he was free to choose instead the federal benefits. If such federal benefits were greater than those under Alaska Workers' Compensation, Icicle would pay the difference. This is a reasonable reading of the paragraph, especially in light of the fact that Icicle's coordination was not automatic since it required Huseman to affirmatively request "to opt out of the Alaska Worker's Compensation system in favor of Federal benefits."

**[7]** Regardless of Icicle's explanation of this paragraph, Huseman did not rely on the Terms of Employment in delaying his filing. To the contrary, his testimony was that he did not remember anything about the Terms of Employment at the time of his injury. He does not claim that he read it long ago and then sat back in reliance on the coverage explained therein. Thus, this paragraph can hardly be bootstrapped into a claim of fraudulent concealment. Instead, Huseman just "assumed" that Icicle would take care of everything for him, including his now untimely federal Jones Act and unseaworthiness claims, because Icicle was helping with his Alaska Workers' Compensation benefits.

The question is whether that assumption was reasonable. By law, Icicle was required to file a claim for Huseman for the Alaska benefits. By doing so, did Icicle fraudulently conceal Huseman's federal options? Could Icicle's assistance in processing the Alaska Workers' Compensation benefits reasonably be viewed as likely to mislead an employee into believing that Icicle voluntarily shouldered a duty to disclose, file, or process any federal claims arising out of an injury, such as a statutory cause of action under the Jones Act or a tort claim under the unseaworthiness doctrine?

**[8]** Huseman's assumption is insufficient to support an equitable estoppel claim. There is a wide gap between fraudulent concealment and even pernicious lulling into a false sense of security, and what occurred here. We agree with the district court's succinct summation: "[Huseman] was not misled by

anything defendants said, did not say, or did. He was simply unaware that seamen enjoy special protections under the law and his employer was under no obligation to advise him on that point." The dissent's argument regarding the effect of the Terms of Employment and Icicle's Employment Brochure ignores the reality that Huseman did not rely on or reference these documents. Recognizing that we review the district court's equitable estoppel determination for abuse of discretion, we affirm the district court.

## III.   WARDS OF THE COURT DOCTRINE

Huseman attempts to bolster his arguments as to equitable tolling and equitable estoppel by arguing that the court should take into consideration his special status as a seaman and a "ward of the court." This argument is unavailing because the "wards of the court" doctrine, while extending special protections to seamen under certain circumstances, does not impose a fiduciary duty on ship owners to serve as legal advisors to their employees, requiring them to provide unsolicited explanation of the availability of federal claims.

**[9]** The "wards of the court" doctrine was created to account for the "special circumstances attending [the seaman's] calling," because the "seaman, while on his vessel, is subject to the rigorous discipline of the sea and has little opportunity to appeal to the protection from abuse of power which the law makes readily available to the landsman." *Socony-Vacuum Oil Co. v. Smith*, 305 U.S. 424, 430-31 (1939). "The physical conditions under which the seaman labors are extremely hazardous." *Cal. Home Brands, Inc. v. Ferreira*, 871 F.2d 830, 837 (9th Cir. 1989).

**[10]** Invocation of the "wards of the court" doctrine is to be linked to the specific policy reasons for its creation. For example, in *Socony*, the Court declined to apply the common law rule of assumption of risk, and instead used the rule of comparative negligence, because it recognized that seamen

are often in the unusual position of having to make quick decisions under hazardous circumstances using whatever equipment they are given. *See* 305 U.S. at 431-32.

**[11]** For similar policy reasons, courts have applied the "wards of the court" doctrine in construing seamen's contracts, particularly when they involve the release of rights. "Notably, we reserve our highest scrutiny for agreements under which a seaman releases the vessel owner of liability because of the understandable concern that such releases may leave the seamen devoid of legal redress." *Thorman v. Am. Seafoods Co.*, 421 F.3d 1090, 1096 (9th Cir. 2005). This approach accounts for the typical inequality of bargaining power between seamen and ship owner:

> The analogy . . . between seamen's contracts and those of fiduciaries and beneficiaries remains, under the prevailing rule treating seamen as wards of admiralty, a close one. Whether the transaction under consideration is a contract, sale, or gift between guardian and ward or between trustee and cestui, the burden of proving its validity is on the fiduciary. He must affirmatively show that no advantage has been taken; and his burden is particularly heavy where there has been inadequacy of consideration.

> The wardship theory has, as was recognized by the courts below, marked consequence on the treatment given seamen's releases. Such releases are subject to careful scrutiny. "One who claims that a seaman has signed away his rights to what in law is due him must be prepared to take the burden of sustaining the release as fairly made with and fully comprehended by the seaman."

*Garrett v. Moore-McCormack Co.*, 317 U.S. 239, 247-48 (1942) (quoting *Harmon v. United States*, 59 F.2d 372, 373 (5th Cir. 1932)).

**[12]** For purposes of this appeal, Huseman acknowledges that the paragraph explaining benefits in the Terms of Employment is not a contractual release of his rights. Nor could the Terms of Employment be construed as any kind of waiver or release of rights. Neither are there any colorable claims that the Terms of Employment are invalid or that Icicle has taken advantage of Huseman. Thus, the special scrutiny typically reserved for release of rights in seaman's contracts cannot be extended to the circumstances here. *See Thorman v. Am. Seafoods Co.*, 421 F.3d at 1096 (reserving the highest scrutiny for contracts in which seaman relinquish their rights); *Orsini v. O/S Seabrooke O.N.*, 247 F.3d 953, 958-59 (9th Cir. 2001) (applying the "wards of the court" doctrine to a contract in which a seaman released his rights).

**[13]** Neither does the "wards of the court" doctrine create a general fiduciary duty to inform Huseman of all his potential federal causes of action. In *Thorman*, a seaman wage calculation case, we rejected an effort to expand the "wards of the court" doctrine "to encompass a full-blown fiduciary relationship" that would "envelop aspects of the seaman-vessel owner relationship far beyond the release context." 421 F.3d at 1097. The seaman argued that vessel owners had an affirmative duty to explain their precise compensation methodology or to disclose their financial calculations. *Id.* at 1098. We disagreed, holding that "[d]espite a long line of cases that describe seamen as 'wards of the court' needing special protections from potentially overreaching ship owners, the scope of these special protections is not unlimited and nothing supports Thorman's effort to invoke a fiduciary duty that requires American Seafoods to disclose its specific pricing methodology." *Id.* at 1096 (citations and internal quotation marks omitted).

**[14]** This is a case of a plaintiff waiting too long to file suit. There is no overreaching ship owner taking advantage of an isolated seaman. Huseman offers no specific evidence that he was misled, either by the Terms of Employment or by Icicle's

conduct. He had ample opportunity to inquire about the possibility of federal benefits and even about federal maritime causes of action, such as Jones Act and unseaworthiness claims. Following *Thorman*, we decline to impose a general, all-encompassing fiduciary duty on ship owners to inform seamen of all potential federal claims and benefits and the process for securing them when the employee fails to make even a threshold inquiry.

## IV. LACHES

Laches is an equitable affirmative defense available for actions that do not have a specific applicable statute of limitations, such as Huseman's maintenance and cure claim. *See Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002). "[T]he appropriate standard of review of a determination of whether laches applies in a particular case is abuse of discretion." *In re Beaty*, 306 F.3d 914, 921 (9th Cir. 2002).

**[15]** "The affirmative defense of laches requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *In re Beaty*, 306 F.3d at 926-27 (internal quotation marks omitted); *see also Jarrow Formulas*, 304 F.3d at 838.

Although courts often have presumed that laches is applicable in a suit filed beyond the analogous state limitations period, the presumption is weak. In the laches analysis, the statute of limitations is not given decisive weight. *Espino v. Ocean Cargo Line, Ltd.*, 382 F.2d 67, 68 (9th Cir. 1967). "[N]o arbitrary or fixed period of time has been, or will be, established as an inflexible rule . . . ." *In re Beaty*, 306 F.3d at 927 (citation omitted). There must be "particularized evidence to support [the] assertion that the time lag between knowledge of the potential action and the filing of the action was unreasonable in length. Mere delay alone will not establish laches . . . ." *See id.*

Regardless of the applicable analogous statute of limitations, Icicle still has the burden of proving prejudice from the delay. *Id.* As we emphasized in *Jarrow Formulas*, even for lawsuits filed beyond the analogous statutory period, "the party asserting laches . . . must show that (1) [plaintiff's] delay in filing suit was unreasonable, and (2) [defendant] would suffer prejudice caused by the delay if the suit were to continue." 304 F.3d at 838.

Huseman filed suit less than one month after learning of his remedies and just under six months beyond the three-year statute of limitations.[1] It is mere speculation that this brief delay was unreasonable. Although he may not have been diligent vis-à-vis a strict statute of limitations, he did pursue his federal claims very quickly once he consulted an attorney. Because any presumption predicated on the statute of limitations is necessarily weak, diligence is to be assessed in the context of a claim that has no specific statute of limitations and is intended to provide coverage for the seaman.

Huseman's short delay must be balanced against specific

---

[1]Huseman alleges that the appropriate period is a "six-year contract statute of limitations," but he does not specify a jurisdiction. According to the record, Huseman is a citizen of Oregon, he was injured in Alaska, and Icicle is located in Seattle, Washington. The district court passed on deciding the applicable limitations period, and the record is not developed as to what jurisdiction would govern any potential contractual claim by Huseman, or whether the Terms of Employment are a contract. We therefore do not decide what limitations period applies. For the purposes of this opinion, we assume that Alaska law governs, and note that the statute of limitations is three years, whether the maintenance and cure claim is classified as a maritime tort or as a contract claim. *See* 46 App. U.S.C. § 763a; *Usher v. M/V Ocean Wave*, 27 F.3d 370, 371-72 (9th Cir. 1994) ("The language and legislative history of Section 763a indicate Congress intended the three-year limitations period established by that section to apply to all maritime personal injury claims. . . . [and] *all* maritime torts.") (quoting *Friel v. Cessna Aircraft Co.*, 751 F.2d 1037, 1038 (9th Cir. 1985) (emphasis in original) (per curiam); Alaska Stat. § 09.10.053 (1997) (setting a three-year statute of limitations for contract claims).

findings of prejudice that would be suffered by Icicle if the maintenance and cure claim were to proceed. *See Espino*, 382 F.2d at 70 (remanding to the district court for specific factual findings as to any prejudice the defendant may have suffered in light of the "slight delay" of three months beyond the statute of limitations, and for a holding as to whether it would be inequitable to enforce the claim after balancing the prejudice and the justification for the delay). The most important aspect of a laches determination is whether Icicle has truly been prejudiced by the five and one-half month delay; "laches is not a doctrine concerned solely with timing. Rather, it is primarily concerned with prejudice." *In re Beaty*, 306 F.3d at 924.

[16] Significantly, the district court made no specific findings of prejudice; instead, it articulated a rationale for why the delay was unreasonable—Huseman's ignorance of the law and failure to make inquiry— and simply made the conclusory statement, with no elaboration, that the delay "has prejudiced [Icicle]." This generic statement, made without reference to any specific factual findings or determination of prejudice, cannot support a dismissal based on laches.

[17] Icicle had ample incentive to investigate Huseman's accident thoroughly, knowing that Huseman could "request at any time to opt out of the Alaska Worker's Compensation System in favor of Federal benefits." Icicle also had an interest in investigating the accident to prevent similar injuries to other employees. The availability of witnesses and their ability to recollect is unlikely to have changed considerably in the five month period after the presumptive three-year limitations period expired and before Huseman filed suit. Under *Espino*, the district court must determine on remand whether the fact that Huseman filed suit forty-one and one half months, rather than thirty-six months, after his injury seriously prejudiced Icicle.

**AFFIRMED** as to the Jones Act and unseaworthiness claims; **REVERSED and REMANDED** as to the maintenance and cure claim.

Each party shall bear its own costs on appeal.

---

REINHARDT, Circuit Judge, dissenting:

The majority allows a maritime employer to exploit the ignorance of an injured seaman and avoid paying him the compensation to which he is entitled under federal law, although for untold years it has been the policy of admiralty law to protect all seamen against this very type of willful exploitation. Icicle Seafoods advised Huseman and other seamen, in their Terms of Employment and in the Employee Handbook, that if they were to be injured, their benefits would be paid by Alaska Workers' Compensation, and Icicle would coordinate any other benefits to which they were entitled under federal maritime law. It did this knowing that under federal maritime law it is responsible for paying maintenance and cure to its injured employees and is liable to suit under the Jones Act and under the doctrine of unseaworthiness. Then, when Huseman was injured, Icicle filled out Alaska Workers' Compensation paperwork for him and gave him the names and phone numbers of people to contact regarding the Alaska Workers' Compensation claim. It did not mention, however, that it was required to provide more generous compensation under federal law and certainly did nothing to coordinate the federal benefits or protect Huseman's legal rights. Icicle Seafood's whole pattern of behavior was designed to lull Huseman into a false sense of security, making him believe that, as his employer, it was looking out for him because it was taking care of all of his claims, a belief that Icicle hoped would last until the statute of limitations ran on the federal claims. Then, when Huseman came to Icicle a few months after the statute of limitations ran, and asked it to pay him what he was due, as it had promised to do in his Terms of Employment, Icicle, having succeeded in its objective, refused, relying on the statute of limitations and the doctrine of laches as defenses.

Such conduct by an employer should disturb jurists in any context. It is particularly troubling, however, that the majority, contrary to hundreds of years of jurisprudence, approves the treatment of an "untutored" seaman in such a deceptive, harsh, and inequitable manner. Seamen are "no ordinary employees." *Thorman v. American Seafoods Co.*, 421 F.3d 1090, 1098 (9th Cir. 2005). They receive special protection because they are "exposed to the perils of the sea," are "often vulnerable to the exploitation of [their] employer," and "there exists a great inequality of bargaining position between large ship owners and unsophisticated seamen." *Chandris v. Latsis*, 515 U.S. 347, 354 (1995); *Fuller v. Golden Age Fisheries*, 14 F.3d 1405, 1408 (9th Cir. 1994) (internal quotation marks omitted). Shipowners' special obligations toward seamen were established in many seafaring countries by the time of the Eighteenth Century. Michael J. Cerniglia, *Is it Time to Cure the Doctrine of Maintenance and Cure?*, 4 LOY. MAR. L.J. 67, 71 (2005). Justice Story, in *Harden v. Gorden*, 11 F.Cas. 480 (1823), noted that such special protections had "received the approbation of continental Europe," and the famed justice then incorporated into United States common law the protections established by British common law, as well as those established by widely shared statutory provisions. *Id.* at 483. Since Justice Story's decision, a long line of cases continues to treat seamen as "wards of the court needing special protections from potentially overreaching ship owners" like Icicle. *Fuller v. Golden Age Fisheries*, 14 F.3d 1405, 1408 (9th Cir. 1994) (internal quotation marks omitted); *Dragich v. Strika*, 309 F.2d 161, 163 (9th Cir. 1962).

The well-established special protections afforded seamen require equitable estoppel, and possibly equitable tolling, of Huseman's Jones Act and unseaworthiness claims. They also preclude the application of laches to his maintenance and cure claim. The majority's decision allowing shipowners to exploit the ignorance of trusting seamen stands in sharp conflict with centuries of precedent and undermines the longstanding protections afforded these vulnerable workers. Because, like Jus-

tice Story, "I am not bold enough to desert the steady light of maritime jurisprudence," I dissent. *Harden*, 11 F.Cas. at 483.

## I. Special Protections Due to Seamen — Equitable Estoppel in General

The special protections that the majority purports to acknowledge but then wholly disregards place additional burdens on shipowners to inform and provide for the seamen they employ. When shipowners fail to do so, courts are required to step in and protect their "wards." In this case, contrary to the majority's assertion, the protections due seamen require the application of equitable estoppel to Huseman's Jones Act and unseaworthiness claims.[1]

The Supreme Court has declared that courts should "avoid, within reasonable limits, the application of rules of the common law which would affect [seamen] harshly because of the special circumstances surrounding their calling." *Socony-Vacuum Oil Co. v. Smith*, 305 U.S. 424, 431 (1939). Any "ambiguities or doubts are resolved in favor of the seaman." *Vaughan v. Atkinson,* 369 U.S. 527, 532 (1962). In no area do seamen get more protection than in the context of recovery for injuries. *Thorman*, 421 F.3d at 1097. Courts have repeatedly interpreted the law to prevent "ship owner[s] from delegating, shifting or escaping [their] duty toward injured employees." *Waldron v. Moore-McCormack Lines, Inc.*, 386 U.S. 724, 728 (1967).

For this reason, the Supreme Court has determined that the Jones Act and other "remedial legislation for the benefit and protection of seamen" must be "liberally construed" to avoid the harsh application of the law. *Socony-Vacuum Oil Co. v.*

---

[1]Because maintenance and cure is an equitable remedy, the doctrine of laches governs, rather than a statute of limitations. Much of the analysis in this Section, and in Sections II and III, is applicable, however, to Icicle's attempt to invoke laches and ultimately defeats this defense.

*Smith*, 305 U.S. 424, 431 (1939). Specifically, the Court has explained that the applicable statute of limitations under the Jones Act "is not totally inflexible, but, under appropriate circumstances, it may be extended beyond three years." *Burnett v. New York Cent. R.R. Co.*, 380 U.S. 424, 427 (1965).[2] Extensions of the time limits for Jones Act and unseaworthiness claims are appropriate where the "congressional purpose is effectuated by tolling the statute of limitations in given circumstances." *Id*. That purpose, "to afford[ ] adequate protection to seamen through an exaction of a high degree of responsibility of owners" would be furthered by estopping the shipowner from using the statute of limitations as a defense where it failed to inform a seaman of his legal rights. *Socony-Vacuum Oil Co*, 305 U.S. at 432.

Equitable estoppel is particularly appropriate here because, at least until the majority's opinion in this case, shipowners had an obligation to inform injured seamen of their legal rights. Courts consistently recognized a fiduciary duty owed the seamen by the shipowner that places the burden upon the latter to insure that an injured seaman acts with a "full understanding of his rights." *Orsini v. O/S Seabrooke O.N.*, 247 F.3d 953, 959 (9th Cir. 2001). The court in *Orsini* observed,

> Where an injured seaman is not represented by counsel, it is the owner's obligation to make a 'full, fair and complete disclosure as to all of [a seaman's] rights, including his right to sue for damages under the Jones Act, and his right to wages, maintenance and cure under the applicable Seamen's Law.'

*Id*. at 964 (citation omitted). Accordingly, contrary to the majority's unsupported assertion, shipowners do have the

---

[2]Although *Burnett* addressed the Federal Employers Liability Act ("FELA"), the Supreme Court has held that the "Jones Act adopts the entire judicially developed doctrine of liability under [FELA]." *American Dredging Co. v. Miller*, 510 U.S. 443, 455-56 (1994).

duty to act as "legal advisors to their [injured] employees." Maj. op. at 19907. Where such a duty exists, "passive concealment," meaning "mere nondisclosure or silence," is sufficient to estop the party with the duty from enforcing the statute of limitations. *Thorman*, 421 F.3d at 1096; *United States v. Colton*, 231 F.3d 890, 899 (4th Cir. 2000) (defining passive concealment).

It is clear that, under *Orsini*, Icicle is equitably estopped from raising the statute of limitations as a defense against Huseman's unseaworthiness and Jones Act claims. Like the plaintiff in *Orsini*, Huseman was not represented by counsel. *Orsini*, 247 F.3d at 964-65. Nor was he "informed of even his basic entitlements." *Id*. at 964. He had no idea that he was eligible for damages under the Jones Act or the unseaworthiness doctrine. Because of this ignorance, he received only the lesser remedy of workers' compensation. It is undisputed that Icicle passively concealed his federal claims. At oral argument, Icicle acknowledged that no one at the company ever suggested to Huseman that he might have Jones Act or unseaworthiness claims. Thus, under *Orsini*, Icicle's passive concealment of Huseman's federal rights is sufficient to warrant equitable estoppel.

The majority attempts to distinguish *Orsini* on the ground that it involves a release, suggesting that the special duty to inform applies in injury cases involving releases because of the inequality of bargaining power between seamen and shipowners, but that no such duty applies in injury cases in which a release is not at issue. However, *Thorman* rejects the notion that special protections apply only in cases involving releases, and determines instead, in accordance with the longstanding common law rule, that the doctrine applies in all cases involving injuries to seamen. *Thorman* states that "a release or *other claim arising from a physical injury* or the perils of the sea," warrants application of "special protections." 421 F.3d at 1097 (distinguishing "a release or other claim arising from a physical injury or the perils of the sea," which necessitates

application of "special protections," from claims relating to employment contracts, which do not) (emphasis added). As *Thorman* puts it, the special protections apply "in a release *or* injury case," not, as the majority here would have it, only in cases involving both a release *and* an injury. Huseman's Jones Act and unseaworthiness claims "aris[e] from a physical injury," and so, under *Thorman*, Huseman is entitled to the special protections afforded injured seamen.

Our previous cases, by expressing concern with any occurrence that "leave[s] the seamen devoid of legal redress," also preclude the majority's attempt to differentiate between injury claims involving releases and other injury claims. *Thorman*, 421 F.3d at 1096. Because of this concern, courts "have given liberal interpretation to [shipowners'] obligation[s] in the personal injury context" and have said that the obligations of a shipowner to an injured seaman "should not be hampered by restrictive distinctions which would defeat its broad beneficial purposes." *Dragich v. Strika*, 309 F.2d 161, 163 (9th Cir. 1962) (holding that the shipowner was obligated to provide maintenance and cure to a seaman whose pre-existing Parkinsons disease first manifested itself while at sea); *see also Waldron v. Moore-McCormack Lines, Inc.*, 386 U.S. 724, 726-27 (1967) (expanding the definition of "unseaworthy" to include instances in which an insufficient number of men are assigned to a particular task). If differentiating between injuries caused by the shipowner and pre-existing illnesses unrelated to employment is a "restrictive distinction" that would defeat the purpose of federal benefits, it is difficult to justify distinguishing between releases and other mechanisms that cause seamen to fail to exercise their rights. Accordingly, contrary to the majority's assertion that Huseman's employer was under no obligation to advise him of his federal claims, this court's precedent requires that Icicle "make a full, fair and complete disclosure as to all of [Huseman's] rights, including his right to sue for damages under the Jones Act, and his right to wages, maintenance and cure under the applicable Seaman's laws." *Orsini*, 247 F.3d at 964 (internal quotation marks omitted).

It is particularly apparent that such a disclosure was required in this case because Icicle affirmatively advised Huseman that it would coordinate his federal benefits and did not mention any exceptions or requirements. At the very least, having made these assurances, Icicle should have told Huseman which claims they would coordinate and which, if any, he was required to handle himself. By giving Huseman false assurances instead of information, Icicle encouraged him to forego his rights and accept less generous benefits than he would otherwise have received, just as happened in *Orsini*. Under *Orsini*, even if shipowners did not always have a duty to inform injured seamen of their rights, when a shipowner falsely assures an employee that it will take care of all of his claims resulting from any injury, and as a result he abandons his rights as effectively as if he had signed a formal release, the rules regarding special protections apply.

Even under the majority's own test, which limits the special protections due seamen to occurrences linked to the policy reasons for their creation, these protections would apply here. The ward of the court doctrine exists, in part, because seamen are too "poor, friendless, and improvident" to assert their rights. *Vaughan*, 369 U.S. at 531. It also exists "because they are by the peculiarity of their lives liable to sudden sickness from change of climate, exposure to perils, and exhausting labor." *Chandris v. Latsis*, 515 U.S. 347, 354-55 (1995). These conditions created the need for the Jones Act and the unseaworthiness doctrine, as well as for the special protections that ease recovery for seamen, in order to "compensat[e] or offset[ ] the special hazards and disadvantages to which they who go down to the sea in ships are subjected." *Id*; *see also Thorman*, 421 F.3d at 1097 ("[T]he peculiar conditions of seamen's employment [are] the basis for such extraordinary remedies being made available to those who accept this calling." (internal quotations omitted)). Huseman's injury was the result of his "exhausting labor." *Chandris*, 515 U.S. at 354-55. He failed to file suit earlier because of his ignorance. The ward of the court doctrine exists to protect the rights of

workers like Huseman under precisely these circumstances. Thus, application of the doctrine here is directly linked to the policy reasons justifying its creation.

Faced with this longstanding law, the majority attempts to rely on language in *Thorman* regarding the level of scrutiny applied to releases. Maj. op. at 19920. This case, however, is not about the level of scrutiny. It is about the ward of the court doctrine and the fiduciary duty shipowners owe to injured seamen, which, the *Thorman* court determined, apply to Jones Act and unseaworthiness claims. *Thorman*, 421 F.2d at 1097.

Perhaps the majority's inexplicable hostility to the legal protections due injured seamen derives in part from a mistaken belief that seamen are no longer the "ignorant and helpless" men of old. *Johnson v. Offshore Tankers Svc. Inc.*, 789 F.2d 1417, 1419 (9th Cir. 1986). However, the Supreme Court reaffirmed the ward of the court doctrine only a decade ago and the Ninth Circuit did so even more recently. *Chandris v. Latsis*, 515 U.S. 347, 354 (1995); *Orsini*, 247 F.3d at 959. Huseman's Terms of Employment also demonstrates that seamen continue to be "poor, friendless, and improvident," with limited access to information. *Vaughan*, 369 U.S. at 531. It informed Huseman that during busy periods he could expect to work 16 hours or more per day under "cold, drafty, and wet" conditions for a starting salary of only $6.00 per hour. He was not allowed to have subscriptions to newspapers or magazines sent to the ship. Nor would there have been much space for books in the one duffel bag and one small carry-on he was allowed to bring on the ship, in which he had to pack *everything* (including soap and cigarettes) needed for a trip of indefinite duration. Accordingly, even as of today, the record gives no cause to suspect that the reasons for affording special protections to injured seamen no longer prevail.

Thus, shipowners are required to continue to inform injured seamen of their rights, especially when they take responsibil-

ity for handling injury claims. Because Icicle failed to inform Huseman of his federal rights, or otherwise help protect him against the forfeiture of his rights, I would hold that it is equitably estopped from invoking the statute of limitations as a defense to his Jones Act and unseaworthiness claims.

## II.    Equitable Estoppel Due to Affirmative Misconduct

Even if the majority were correct that shipowners do not generally have a fiduciary duty to inform injured seamen of their federal rights, equitable estoppel would still apply with respect to Huseman's Jones Act and unseaworthiness claims. Absent a fiduciary duty, equitable estoppel applies where (1) the plaintiff reasonably relies on the defendant, (2) there is evidence of "the defendant's actual or constructive knowledge of the deceptive nature of its conduct," and (3) the purpose of the limitations period would be satisfied. *Santa Maria v. Pac. Bell*, 202 F.3d 1170, 1176 (9th Cir. 2000). "[C]onduct or representations by the defendant-employer which tend to lull the plaintiff into a false sense of security can estop the defendant from raising the statute of limitations." *Atkins v. Union Pac. R.R. Co.*, 685 F.2d 1146, 1149 (9th Cir. 1982) (finding that equitable estoppel applied where the defendant told the plaintiff it would settle but delayed doing so until after the statute of limitations ran if "the defendant knew or suspected that [the plaintiff] was unrepresented; if it knew or suspected that he had a limited ability to protect his own interests; and if [the plaintiff] relied on the [defendant's] assurances that [it] would settle the claim").

Icicle lulled Huseman into a false sense of security by assuring him that it would take care of his benefits and by acting as if it were doing so. Icicle first took steps to lull Huseman by giving him the Terms of Employment, which states,

> If you are injured while working on the floating processor, it may be covered under Alaska Worker's Compensation and/or under Federal Maritime bene-

fits. Unless requested otherwise, we will process any claim through the Alaska Workers' Compensation system and coordinate any additional benefits that may be due under Federal Maritime Law; however, you may request at any time to opt out of the Alaska Worker's Compensation system in favor of Federal benefits.

This clause suggests that, should an employee become injured, Icicle will take care of everything and ensure that he will receive everything he is due. Icicle promised to do this automatically, with no effort on the part of the injured seaman, "unless requested otherwise." The clause does not define or limit the federal benefits that Icicle will coordinate, implying, at least to someone without sophisticated legal training, that Icicle would coordinate all federal claims. The clause further suggests that there are no deadlines that the seaman needs to worry about since he is free to change his benefits "at any time."

Even though Huseman did not remember the clause, his review of the Terms of Employment would undoubtedly have left him with the impression that he did not need to worry about medical bills and that there was nothing he was required to remember in order to receive all to which he was entitled. Icicle would take care of everything, and if he was unsatisfied *at any time* it would not be too late to change. In fact, Huseman may well have forgotten about the disputed clause precisely because of these misleading assurances.[3]

Huseman's false sense of security was no doubt reinforced by Icicle's post-injury conduct. This conduct created the impression that Icicle was taking care of Huseman and that

---

[3]The majority attacks this inference because it is not compelled by the record. In doing so, it disregards the well-established rule that on summary judgment we must make all justifiable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986).

workers' compensation was his only remedy. Immediately following his injury, Icicle "directed" him to state workers' compensation. Icicle filled out much of the form. It sent him to a physician's assistant who also filled out workers' compensation paperwork, although Huseman did not ask him to do so. Icicle then mailed the workers' compensation paperwork on his behalf and gave him a list of people to contact regarding his workers' compensation claim. Throughout all this time, Icicle made no mention of the federal rights or benefits to which he was entitled.

Not only did Icicle lull Huseman into a false sense of security, it seems to have actively tried to keep its employees in the dark about their federal rights. For example, even though shipowners are required by federal law to provide maintenance and cure to any seaman who becomes ill for any reason, the Terms of Employment twice suggests that such bills must be paid by the seamen. It states, for example, "If you must leave the floating processor for medical care that is not job related, transportation and clinic expenses will be charged to you without your approval." This is so obviously inaccurate that it suggests intentional misconduct on the part of Icicle. It is unlikely that Icicle would inform its employees that they would be billed for expenses that it is required to pay unless it was attempting to hide information from them about their entitlement to federal benefits in order to avoid paying them those benefits.

Huseman's employment brochure was also written so as to direct his attention to workers' compensation, rather than federal benefits, as his remedy in case of injury. The brochure states, "All employees have withheld from their wages amounts specified by federal and state law and, accordingly, are covered by Worker's Compensation, Social Security, Unemployment Compensation, and other benefits prescribed by law." Mr. Huseman reasonably understood this provision to mean that money was deducted from his paycheck for workers' compensation, and that workers' compensation

would cover him if he were injured. In fact, no money was taken out of Huseman's paycheck for workers' compensation, and he had superior benefits under federal law. Even assuming that Icicle was under no obligation to inform Huseman of his benefits, this clause is illustrative of Icicle's pattern of taking advantage of its employees' ignorance by directing their attention to workers' compensation to the exclusion of the more costly federal benefits. At the very least, Icicle should have been aware that the information it provided Huseman was misleading, which is all that *Pacific Bell* requires.

The majority incomprehensibly reads the Terms of Employment as saying that Huseman must opt out of his Alaska benefits before Icicle will coordinate his federal benefits. The majority asserts that the promise to coordinate benefits in the Terms of Employment exists "to inform Huseman that at any time he was receiving Alaska Workers' Compensation, he was free to choose instead the federal benefits. If such federal benefits were greater than those under Alaska Workers' Compensation, Icicle would pay the difference." Maj. op. at 19917-18. This reading appears to be entirely a concoction of the majority's. It is wholly unsupported by the text, which would suggest precisely the opposite, even to a well-educated lawyer. By first saying that an injured seaman "may be covered under Alaska Worker's Compensation *and*/or under Federal Maritime Benefits" and then adding that "we will process any claim through the Alaska Workers' Compensation system *and* coordinate any additional benefits that may be due under Federal Maritime Law," Icicle committed to *both* processing the workers' compensation claim *and* coordinating additional federal benefits. Nowhere does the provision state that Huseman must take affirmative action in order to "pursue federal remedies." Rather, the clause states that Huseman may be covered under both and that coordination *will* occur unless Huseman requests otherwise. Nor does the paragraph suggest that he must chose between the two, or opt out of one set of benefits in order to receive the other. By promising to "coordinate any additional benefits" then, Icicle prom-

ised to "disclose, file, or process any federal claims." Maj. op. at 19918.

The fact that the provision also states, "however, you may request at any time to opt out of the Alaska Workers' Compensation system in favor of Federal benefits" does not change the meaning of the key phrase, "additional." It suggests only that, instead of receiving state *and* federal benefits, coordinated by Icicle, the employee may elect to receive only federal benefits. What the relative advantages and disadvantages of such an option may appear to be to an impecunious seaman remains wholly unexplained. Under such circumstances, the untutored seaman would most likely assume that he would be better off receiving both state and federal benefits, rather than just receiving federal benefits. Even a highly educated individual might reasonably expect that more benefits would mean more money, or at least would not mean less money.

The majority, however, adheres to its tortured reading of the clause in spite of our precedent mandating that, in resolving such questions, the interpretation most beneficial to the seaman must be adopted. *See Medina v. Erickson*, 226 F.2d 475, 479 (9th Cir. 1955). In holding uneducated seamen to a standard that most large firm corporate partners would not meet, the majority leaves employers free to make misleading statements that obfuscate their employees' legal rights, prevent them from filing suit, and then escape liability by arguing before this court that the statements must be interpreted in a way that cannot possibly have been understood by the untutored seaman. Even if the employer had no general duty to inform injured seamen of their rights, it would be responsible for the consequences of its confusing and misleading statements. Thus, there is no basis for reading the Terms of Employment as anything other than what it would appear to be to Huseman: a promise to take care of *all* his potential rights to recovery should he suffer injury in the course of his employment.

The majority also asserts that Huseman cannot establish that he reasonably relied on Icicle. It argues that he could not have relied on its misrepresentations in the Terms of Employment because he did not remember the terms of the clause in the Terms of Employment that was relevant to his claim. It concludes that he cannot show reasonable reliance without the Terms of Employment since Icicle's assistance with the workers' compensation claim was not, by itself, enough to make reliance on Icicle reasonable. However, as explained above, the fact that Huseman did not remember the clause does not mean that he did not rely on it. *See supra*, p. 19934. Nor is there any doubt that Huseman relied on Icicle. There is ample evidence in the record, some quoted by the majority, demonstrating Huseman's actual reliance on Icicle's general conduct. Huseman testified that Icicle "said they'd fix it all up for me, so I had no reason not to trust them . . . ." He also explained that "[e]verything Icicle did was tell me I had a workmen's comp claim and here's the forms and here's the people to call . . . Now I think it's misleading, and I was trusting them."

In sum, Huseman has established the elements necessary for equitable estoppel. He reasonably relied on Icicle, and Icicle's conduct lulled him into a false sense of security. Icicle promised to take care of all of his potential claims, and appeared to him to be doing so, causing him not to pursue his legal entitlements on his own and file a lawsuit earlier. The evidence strongly suggests that Icicle's conduct was intentional, but even if it had not been, its statements were so obviously misleading that it should, unquestionably, have been aware of their deceptive nature. For these reasons, Icicle is estopped from relying on the statue of limitations as a defense against Huseman's Jones Act and unseaworthiness claims.

## III.   Equitable Tolling

Because I conclude that equitable estoppel applies, I need not reach the question of equitable tolling, although I think it

likely that Huseman would prevail on that theory as well. I do note, however, that the majority misrepresents the Alaska Worker's Compensation brochure when it states that Huseman should have known that he had an obligation to inquire about his federal claims. That brochure, titled "Workers' Compensation and You," includes a section labeled "Coverage" which reads:

> Nearly all Alaska employees are covered. Commercial fishers are an exception, but some fish processor workers on floating processing vessels are covered. Other exceptions are contract entertainers, some taxicab drivers, part-time babysitters, some cleaning persons, some participants in the Alaska temporary assistance program, some sports officials, harvest help and similar part-time or temporary workers. Most unpaid volunteers are not covered, but some volunteer ambulance attendants, volunteer fire fighters and police officers, volunteer emergency medical technicians, and volunteer civil defense or disaster workers are covered. Sole owners and partners of businesses and executive officers of non-profit corporations are not covered but may choose to buy coverage. Executive officers of corporations-for-profit are covered but may choose to waive coverage. Although federal employees and most maritime workers are not covered under Alaska law, they may be covered under federal law. If you want to know whether you are covered, contact the Division.

By quoting only the last two sentences, the majority creates the impression that the Alaska Workers' Compensation Division offered information about benefits under federal law. The complete passage, however, makes it clear that the Alaska Workers' Compensation Division answers questions about eligibility for *Alaska* benefits. As the passage offers advice regarding Alaska benefits only, there was no reason for Huseman to contact the Alaska Workers' Compensation Division.

He already knew that he was eligible for Alaska Workers' Compensation because he was already getting benefits. Nor does anything in the Alaska Workers' Compensation brochure indicate that injured workers may have remedies under both Alaska Workers' Compensation and federal law. Instead, federal benefits are mentioned as covering some people *not covered* by state law. Even if it were possible to construe the language in the passage as offering advice regarding federal benefits, given its placement in the "Coverage" section of a brochure completely devoted to workers' compensation the most reasonable construction is that it offers information only regarding workers' compensation. Thus, nothing in the brochure should have made anyone, let alone an "ignorant" and "helpless" seaman like Huseman, aware of his federal benefits when he was already receiving workers' compensation.

## IV.   Laches

Had the majority reached the correct outcome on equitable estoppel, it would have been unnecessary for it to remand the maintenance and cure claim to the district court to determine whether laches should apply. The affirmative defense of laches "requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 838 (9th Cir. 2002). Icicle cannot show either element of its laches defense.

First, Icicle cannot demonstrate a lack of diligence on Huseman's part. As explained above, Huseman reasonably relied on Icicle to coordinate any federal claims available to him. He filed this lawsuit only eleven days after he discovered that he had federal claims and that Icicle was not coordinating those claims as promised.

Second, Icicle cannot demonstrate that it was prejudiced by the delay. As explained above, Icicle failed to perform its fiduciary duty of informing Huseman of his rights, thereby

delaying the litigation. It likewise delayed the litigation by lulling Huseman into a false sense of security and thereby discouraging him from filing suit. Because any delay in this litigation was of Icicle's own creation, Icicle cannot claim that it was prejudiced by Huseman's delay.

Thus, because Icicle cannot establish either element of its laches defense, I see no need to remand the maintenance and cure claim. Rather, I would hold Icicle cannot rely on laches as a defense against that claim.

## V.   Conclusion

In light of the special protections due injured seamen, Huseman has shown that equitable estoppel applies with respect to his Jones Act and unseaworthiness claims. The same factors demonstrate that there is no justification for the district court's application of the doctrine of laches to the maintenance and cure claim. A remand on that issue is unnecessary. Reversal is required as to all three claims. In reaching the contrary conclusion, the majority disregards centuries of maritime jurisprudence and undermines the ward of the court doctrine. I dissent.